BEFORE THE DISTRICT COURT OF LIMASSOL

## AFFIDAVIT

I the undersigned, Georgia Nicolaides, from Limassol, ID Card No. 888200, do hereby take oath and say as follows:

1. I am a translator, holder of the French National Graduate and Postgraduate Degree Applied Foreign Languages: translation of business-economic-legal-political affairs, Paul Valéry University, France, and of the National Higher Professional Award in Specialised Studies in Translation: Professional Translation, Paul Valéry University, France, Member of the Pan Cyprian Union of Graduate Translators and Interpreters, Member Id: PanUTI M54, working languages: Greek, English, French and Russian.

2. I have in my above capacity acquired linguistic skills and techniques in professional translation in the business, financial, legal, political, technical and scientific fields, and have by this capacity translated the Greek document (source text) to English (target text) as attached.

3. The English translation is to the best of my knowledge a true and faithful translation of the source text in Greek.

4. The source text in Greek and the translation in English are here below attached as **EXHIBIT A** and **EXHIBIT B**, respectively.

THE AFFIANT

..............................
Georgia Nicolaides
Translator

Sworn and signed before me
this .....?.. of February 2019
in the District Court of Limassol

CANCELLED CANCELLED
13 ...

REGISTRAR

Nektarios Pibpiros

EXHIBIT A

ΕΠΑΡΧΙΑΚΟ ΔΙΚΑΣΤΗΡΙΟ ΛΕΜΕΣΟΥ

ΕΝΩΠΙΟΝ: Ε. ΕΦΡΑΙΜ, Π.Ε.Δ.

Αρ. Αγωγής: 2987/2017

Μεταξύ:

1. Sergey Mayzus
2. Okpay CY Limited
3. Okpay Inc.
4. Mayzus Financial Services Ltd που εμπορεύεται ως Moneypolo

Εναγόντων

v.

1. Alexander Vinnik
2. Canton Business Corporation
3. Always Efficient LLP
4. Eurostyle Advisor Ltd
5. Strategies Provider Ltd
6. Voix Impex LP
7. Edelvace Limited
8. Asomar Investments Ltd
9. Fairplay Finance Limited
10. Micrastur Development Ltd
11. Nicos INC
12. Hill Chance Limited
13. Zilon LP
14. Chartwood Technology LLP
15. Global Network Solutions
16. Neptune Media Ltd
17. Gem Invest LP

Εναγομένων

<u>Αίτηση Εναγόντων ημ. 24.7.18 για Απόφαση</u>

<u>Ημερομηνία</u>: 1η Φεβρουαρίου 2019

<u>Εμφανίσεις</u>:

Για τους Ενάγοντες: κ. Α. Παφίτης με κα Ν. Λιασίδου για Α.Γ. Παφίτης & Σία ΔΕΠΕ

Για τους Εναγόμενους 2-4, 6-9, 11, 14 και 16: ουδεμία εμφάνιση

<u>Α Π Ο Φ Α Σ Η</u>

Με την παρούσα Αίτηση οι Ενάγοντες - Αιτητές ζητούν την έκδοση απόφασης εναντίον των Εναγομένων 2-4, 6-9, 11, 14 και 16 λόγω μη καταχώρισης εμφάνισης.

Σημειώνεται πως η αρχική Αίτηση αφορούσε τους Εναγόμενους 2-17, πλην όμως τελικώς αυτή περιορίστηκε στους ως άνω Εναγόμενους. Εναντίον του Εναγομένου 1 ο οποίος ήταν και ο μοναδικός που καταχώρισε εμφάνιση, η Αγωγή αποσύρθηκε άνευ βλάβης.

Στα πλαίσια απόδειξης της Αγωγής, η πλευρά των Εναγόντων καταχώρισε ένορκη δήλωση του Ενάγοντος στα Αγγλικά, με πιστή μετάφραση αυτής στα Ελληνικά, συνοδευόμενη από μεγάλο αριθμό τεκμηρίων. Αξίζει να αναφερθεί πως στην ένορκη του δήλωση ο Ενάγων αναφέρεται σε κάποια στοιχεία τα οποία δεν επιθυμούσε να αποκαλύψει στην ένορκη δήλωση, πλην όμως αυτά παρουσιάστηκαν εν τέλει στο Δικαστήριο το οποίο είχε τη δυνατότητα να τα μελετήσει.

Οι δικηγόροι των Εναγόντων κλήθηκαν από το Δικαστήριο να αγορεύσουν αναφορικά με τη νομική πτυχή της υπόθεσης, και ειδικότερα αναφορικά με τη φύση και νομική βάση των αξιώσεων των Εναγόντων.

Κατ' αρχάς το Δικαστήριο ικανοποιείται πως η παρούσα Αγωγή έχει δεόντως επιδοθεί στους υπό κρίση Εναγόμενους, ήτοι στους Εναγόμενους 2-4, 6, 9, 11,

14 και 16, εκτός δικαιοδοσίας σύμφωνα με το διάταγμα του Δικαστηρίου ημ. 8.1.18, και στους Εναγόμενους 7 και 8 εντός της Κυπριακής Δημοκρατίας, όπως προκύπτει από τις σχετικές ένορκες δηλώσεις επίδοσης που βρίσκονται καταχωρημένες εντός του φακέλου. Επίσης το Δικαστήριο ικανοποιείται πως οι προαναφερόμενοι Εναγόμενοι δεν καταχώρισαν σημείωμα εμφάνισης εντός της προβλεπόμενης προθεσμίας ή οποτεδήποτε μετά.

Έχω αναγνώσει με προσοχή το περιεχόμενο του γενικώς οπισθογραφημένου κλητηρίου, της έκθεσης απαίτησης και της ένορκης δήλωσης του Ενάγοντος με τα συνημμένα τεκμήρια προς απόδειξη της υπόθεσης. Θεωρώ πως η μαρτυρία που προσάχθηκε από τον Ενάγοντα, πέραν του ότι παρέμεινε αναντίλεκτη ενώπιον μου, παρουσιάζει συνέπεια και λογική και επιβεβαιώνεται από τα συνημμένα τεκμήρια, ούτως ώστε αυτή κρίνεται πλήρως αξιόπιστη και υιοθετείται ως τα ευρήματα του Δικαστηρίου αναφορικά με τα γεγονότα της υπόθεσης στον βαθμό που αφορούν τους ως άνω Εναγόμενους για σκοπούς της παρούσας διαδικασίας.

Εν συντομία, τα γεγονότα της υπόθεσης έχουν ως ακολούθως:

(i) Ο Ενάγων 1 είναι μόνιμος κάτοικος Λεμεσού, γνωστός επιχειρηματίας διεθνώς στον χρηματοοικονομικό και επενδυτικό τομέα, ως ένα από τα πρόσωπα που επινόησαν τις διαδικτυακές συναλλαγές Forex. Είναι ιδιοκτήτης μεγάλου αριθμού επιχειρήσεων σε όλους τους τομείς στην Κύπρο, Τσεχία, Αγγλία και Ρωσία. Διετέλεσε Δήμαρχος σε πόλη στη Ρωσία από το 2008 μέχρι και το 2013, είναι επίτιμο πρόσωπο στη Ρωσία, στην Κύπρο και στην Τσεχία και δραστηριοποιείται και χρηματοδοτεί διάφορες αθλητικές και άλλα πολιτιστικές εκδηλώσεις.

(ii) Ο Ενάγων 1 είναι μέτοχος κατά 50% της Ενάγουσας 2 και κατά 100% της Ενάγουσας 4.

(iii) Η Ενάγουσα 2 είναι εταιρεία παροχής ηλεκτρικών πληρωμών, εγγεγραμμένη στην Κύπρο και κατέχει άδεια λειτουργίας ως ίδρυμα Ηλεκτρονικού Χρήματος από την Κεντρική Τράπεζα της Κύπρου από το 2015. Είναι δικαιούχος των εμπορικών σημάτων Okpay και Weezzo.

(iv) Η Ενάγουσα 3 είναι εταιρεία με έδρα τις Βρετανικές Παρθένες Νήσους και από το 2009 λειτουργούσε ως διαμεσολαβητής της Ενάγουσας 4,

δυνάμει συμφωνίας συνεργασίας. Η Ενάγουσα 2 ιδρύθηκε κατόπιν κοινοπραξίας μεταξύ του Ενάγοντος 1, μέσω χρηματικής επένδυσης, και της Ενάγουσας 3, η οποία συνέβαλε στη δημιουργία της πλατφόρμας υπηρεσιών ηλεκτρονικού χρήματος και στην παροχή του εμπορικού σήματος Okpay.

(v) Η Ενάγουσα 4 είναι εταιρεία εγγεγραμμένη στο Λονδίνο και κατέχει άδεια λειτουργίας ως Χρηματοοικονομικό Ίδρυμα Πληρωμών από την Αγγλική Εποπτική Αρχή Χρηματοοικονομικών Υπηρεσιών Financial Conduct Authority (FCA) από το 2009, με την επωνυμία Mayzus FC και MFS, και ιδιοκτήτρια των εμπορικών σημάτων Mayzus και Moneypolo.

(vi) Περί τον Νοέμβριο του 2012, η Εναγομένη 4, ενεργώντας μέσω του Εναγομένου 1, αποτάθηκε στην Ενάγουσα 3 για άνοιγμα λογαριασμών πληρωμών. Ο λογαριασμός ανοίχθηκε στην Ενάγουσα 4, κατόπιν διαμεσολάβησης της Ενάγουσας 3.

(vii) Ακολούθησε το άνοιγμα λογαριασμών στην Ενάγουσα 4 και από τις Εναγόμενες 2 και 3, για τις οποίες ενεργούσε ο Εναγόμενος 1. Συγκεκριμένα, η Εναγομένη 2 ήταν η ιδιοκτήτρια της πλατφόρμας BTC-e και η Εναγομένη 3 η διαχειρίστρια της, η οποία (πλατφόρμα) λειτουργούσε μέσω της Ενάγουσας 4. Το κοινό θα μπορούσε να ανοίξει λογαριασμό με την Εναγομένη 3 στην πλατφόρμα στην οποία θα προέβαινε σε συναλλαγές (αγορές και πωλήσεις) με παραστατικά νομίσματα, όπως bitcoin, για τις οποίες οι Εναγόμενες 2 και 3 λάμβαναν προμήθειες. Ακολουθούσε η κατάθεση χρημάτων (προμηθειών) στους λογαριασμούς τους οποίους οι Εναγόμενες 3 και 4 διατηρούσαν με την Ενάγουσα 4 η οποία με τη σειρά της θα διεκπεραίωνε πληρωμές προς τρίτα πρόσωπα κατόπιν εντολών και εκ μέρους των Εναγομένων 2 και 3.

(viii) Η Ενάγουσα 4 αποδέχθηκε αυτή τη συνεργασία λόγω του ότι αυτές οι δραστηριότητες ήταν νόμιμες και δεν χρειαζόταν άδεια λειτουργίας από την Αγγλία. Προς τούτο μάλιστα υπεγράφησαν συμφωνίες παροχής υπηρεσιών από την Ενάγουσα 4 προς τις Εναγόμενες 2 και 3.

(ix) Κατά τη διάρκεια της πιο πάνω συνεργασίας, η Ενάγουσα 4 πίστωνε όλα τα ποσά στους λογαριασμούς των Εναγομένων 3 και 4 τα οποία και μετέφερε είτε σε λογαριασμούς τρίτων προσώπων είτε στον λογαριασμό

της Εναγομένης 2. Σε κάποιες περιπτώσεις η Εναγομένη 3 μετέφερνε χρήματα στην Εναγομένη 4 η οποία στη συνέχεια έκανε πληρωμές προς εξόφληση τιμολογίων, προς διάφορες εταιρείες ανά το παγκόσμιο, συμπεριλαμβανομένων και των ως άνω Εναγομένων εταιρειών. Αυτή η συνεργασία αφορά ένα τεράστιο όγκο συναλλαγών, ενδεικτικά μεταξύ 1.7.17-20.7.17, οι εισπράξεις ανήλθαν στο σύνολο τους αριθμητικά σε 7.753.056 σε US$ και 5.665 σε €. Οι πληρωμές που έλαβαν χώρα κατόπιν οδηγιών της Εναγομένης 4 ανέρχονται συνολικά αριθμητικά στις 124.844. Σημειώνεται πως το σύνολο των συναλλαγών παρουσιάστηκε προς το Δικαστήριο σε ηλεκτρονική μορφή (usb) το οποίο το Δικαστήριο είχε τη δυνατότητα να διεξέλθει και επιβεβαιώσει πως επρόκειτο για τεράστιο όγκο συναλλαγών.

(x) Λόγω της ιδιαίτερης φύσης και του τεράστιου όγκου συναλλαγών, στις 28.5.14 η Ενάγουσα 4 κατέθεσε σχετική αναφορά στο NCA της Αγγλίας και από τη στιγμή που δεν έλαβε απάντηση, τότε μπορούσε να συνεχίσει κανονικά τις δραστηριότητες της.

(xi) Κατά τα έτη 2015-2017 η πλατφόρμα BTC-e εξυπηρετούσε τον μεγαλύτερο όγκο συναλλαγών παγκοσμίως και περί τον Ιούνιο-Ιούλιο του 2017 η κίνηση της ήταν πέραν των US$66εκ. ημερησίως.

(xii) Οι δραστηριότητες της πλατφόρμας συνεχίζονταν κανονικά μέχρι και τις 25.7.17, ήτοι μέχρι την εκτέλεση απόφασης του Δικαστηρίου της Καλιφόρνιας των ΗΠΑ η οποία διέτασσε τον εντοπισμό και τη σύλληψη του Εναγομένου 1, ως δικαιούχου της Εναγομένης 2 και δημιουργού της πλατφόρμας, καθώς επίσης και το κλείσιμο αυτής, στη βάση κατηγοριών για συνωμοσία προς νομιμοποίηση εσόδων από παράνομες δραστηριότητες, νομιμοποίηση εσόδων από παράνομες δραστηριότητες και συμμετοχή σε παράνομες νομισματικές συναλλαγές. Με το κλείσιμο της πλατφόρμας, υπολογίζεται πως αριθμός προσώπων παγκοσμίως έχασαν μεταξύ US$200-400εκ.

(xiii) Όπως διεφάνη μέσα από την απόφαση, η πλατφόρμα χρησιμοποιείτο από το 2011 μέχρι και το 2017 από τουλάχιστον 700.000 χρήστες παγκοσμίως, συμπεριλαμβανομένων πολιτικών, δημόσιων προσώπων και εμπόρων ναρκωτικών, με στόχο το ξέπλυμα μαύρου χρήματος.

(xiv) Το όλο θέμα έλαβε τέτοιες διαστάσεις και δημοσιότητα που οι Ενάγοντες συνδέθηκαν με την πλατφόρμα BTC-e ως δήθεν συνεργάτες.

(xv) Η Ενάγουσα 4 αποτάθηκε για απόσυρση δημοσιευμάτων, ανάρτησε στην ιστοσελίδα της Ενάγουσας 2 επίσημη δήλωση πως δεν υπήρχε οποιαδήποτε σχέση τους με τις Εναγόμενες και την πλατφόρμα και ενημέρωσε πως όσα χρήματα έλαβε μετά τις 26.7.17 θα τα επέστρεφε στους δικαιούχους. Ο Ενάγων 1 προέβη επίσης σε δηλώσεις απορρίπτοντας κάθε σύνδεση τόσο του ιδίου όσο και των εταιρειών του με την πλατφόρμα.

(xvi) Δυστυχώς το ζήτημα έλαβε τεράστιες διαστάσεις με αποτέλεσμα να ξεσπάσει το σκάνδαλο BTC-e, τη διασύνδεση των Εναγόντων με αυτό και τη χρήση απειλών στον ίδιο τον Ενάγοντα 1 και την οικογένεια του.

(xvii) Ο Ενάγων 1 κατήγγειλε την υπόθεση στη ΜΟΚΑΣ στην Κύπρο, ενώ τον Οκτώβριο του 2017 ο Άρειος Πάγος επικύρωσε την έκδοση του Εναγομένου 1 για ξέπλυμα US$4δις. μέσω της πλατφόρμας BTC-e ιδιοκτησίας της Εναγόμενης 2, από τη Θεσσαλονίκη στις ΗΠΑ και τον Σεπτέμβριο του 2018 στη Ρωσία. Ο Ενάγων 1 κλήθηκε ως μάρτυρας σε αυτή τη διαδικασία. Εκκρεμεί επίσης αίτημα και των Γαλλικών Αρχών για έκδοση του Εναγομένου 1 αναφορικά με απάτη εις βάρος Γάλλων πολιτών ύψους €130εκ. Δημοσιεύματα φέρουν τον Εναγόμενο 1 να παραδέχεται την εξαπάτηση Ρώσων επενδυτών μέσω της πλατφόρμας και ζημιάς ύψους 750εκ. Ρωσικών Ρουβλιών.

(xviii) Κατόπιν έρευνας και με βάση διάφορες πηγές, προέκυψε πως εμπλεκόμενοι σε αυτό το σκάνδαλο είναι και άλλα πρόσωπα, πέραν των Εναγομένων. Επίσης διεφάνη ότι οι Εναγόμενες 6-9, 11, 14 και 16, ήταν εικονικές εταιρείες στις οποίες αποστέλλονταν χρήματα μέσω της πλατφόρμας, δυνάμει ψεύτικων και εικονικών τιμολογίων. Τα χρήματα αποστέλλονταν από τις Ενάγουσες 3 και 4 κατόπιν οδηγιών των Εναγομένων 2-4. Ένας πολύ μικρός αριθμός τέτοιων μεταφορών αφορά ποσό €10εκ.

(xix) Λόγω των πιο πάνω, τόσο ο Ενάγων 1 όσο και οι Ενάγουσες 2-4 πλήγηκαν και καταστράφηκαν επαγγελματικά και οικονομικά.

(xx) Τράπεζες στην Κύπρο και στο εξωτερικό έπαυσαν την συνεργασία μαζί τους λόγω ακριβώς της αντίληψης περί εμπλοκής τους στο σκάνδαλο.

7

(xxi) Τον Ιούλιο του 2018 έχει ανακληθεί η άδεια λειτουργία της Ενάγουσας 4 από το FCA Αγγλίας για τρεις μήνες και τον Οκτώβριο του 2018 για άλλους τρεις μήνες.

(xxii) Η Ενάγουσα 2 έχει απορριφθεί από τις Γερμανικές Αρχές για δραστηριοποίηση της εκεί.

(xxiii) Τα εμπορικά σήματα Okpay και Moneypolo έχουν διασυρθεί. Το πρώτο μετονομάστηκε σε Weezzo ενώ η Ενάγουσα 4 έχει πλέον καταστραφεί και έπαυσε να χρησιμοποιεί το εμπορικό όνομα Mayzus.

(xxiv) Η συμφωνία πώλησης των μετοχών του Ενάγοντος 1 στην Ενάγουσα 4 έναντι €20εκ. ναυάγησε λόγω της σύνδεσης τους με το εν λόγω σκάνδαλο.

(xxv) Η προοπτική ίδρυσης Τράπεζας με το όνομα Mayzus έχει εξαφανιστεί.

(xxvi) Η Κεντρική Τράπεζα της Κύπρου παραλείπει να απαντήσει σε αίτημα της Ενάγουσας 2 με σκοπό τη δραστηριοποίηση της στη Λιθουανία.

(xxvii) Το όνομα, η φήμη και η αξιοπρέπεια του Ενάγοντος 1 έχουν διασυρθεί και πληγεί.

(xxviii) Περιουσία του στην Τσεχία, και συγκεκριμένα ένα κάστρο του 18ου αιώνα, καταστράφηκε ολοσχερώς από φωτιά.

Το αστικό αδίκημα του δόλου έτυχε ερμηνείας στην υπόθεση **Τσιάρτας κ.ά. v. Alocay Holdings Ltd κ.ά.** (2010) 1(Γ) Α.Α.Δ. 1523, στην οποία λέχθηκε πως «*Σύμφωνα με τους Halsbury's Laws of England, 3rd ed., vol. 18, p. 189, η έννοια του δόλου προσδιορίζεται ως κάτι ανέντιμο, ηθικώς ανάρμοστο, ειδικώς σε απόκτηση χρηματικού οφέλους με άδικα μέσα. (Βλ. επίσης Ιακώβου v. Λαϊκής Κυπριακής Τράπεζας (Χρηματ.) Λτδ (2004) 1(Β) Α.Α.Δ. 992).*» Τα συστατικά στοιχεία του αστικού αδικήματος της συνωμοσίας αναφέρθηκαν στην Αγγλική υπόθεση **Kuwait Oil Tanker Company SAK and another v. Al Bader and others** (2000) All ER (D) 692, ως εξής:

> «*The two types of conspiracy, namely conspiracy to injure by lawful means and conspiracy to injure by unlawful means, were better regarded as species of the same tort, although it mattered not. It was true that in the case of lawful means conspiracy the tort had been developed principally in the sphere of trade disputes and industrial relations disputes, but there was no authority to*

> support the submission that the unlawful means conspiracy was
> limited to that context. The effect of the principal authorities was
> simply that, in order to establish an unlawful means conspiracy, it
> was necessary to establish an intention to injure the claimant but
> not a predominant intention or purpose to do so. Although an
> intention to injure the claimant had to be proved, there was no
> reason why such an intention could not be inferred from the acts
> themselves. Where the unlawful means were tortious the
> conspiracy did not merge in the tort; there was no authority or
> principle to restrict the tort in that way.»

Τα πιο πάνω γεγονότα καταδεικνύουν πως οι Εναγόμενες 2-4, 6-9, 11, 14 και
16 αποτελούν μέρος μιας συνωμοσίας και εφαρμογής ενός δόλιου και
απατηλού σχεδίου μέσω της χρήσης των υπηρεσιών της Ενάγουσας 4.
Ειδικότερα, οι Εναγόμενες 2 και 3 παρέστησαν στις Ενάγουσες 3 και 4 πως οι
ίδιες διεξήγαγαν νόμιμες δραστηριότητες, και οι εν λόγω Ενάγουσες,
βασιζόμενες σε αυτές τις παραστάσεις οι οποίες τελικώς αποδείχθηκαν
ψευδείς, δέχθηκαν να συνεργαστούν μαζί τους. Οι ως άνω Εναγόμενες, με
κύρια συμμετοχή των Εναγομένων 2-4, χρησιμοποίησαν τις υπηρεσίες των
Εναγουσών 3 και 4 με απώτερο σκοπό την υλοποίηση του δόλιου και απατηλού
τους σχεδίου, ήτοι τη δημιουργία και χρήση της πλατφόρμας BTC-e για τη
διακίνηση και διοχέτευση σε όλες τις ως άνω Εναγόμενες χρημάτων τα οποία
προέρχονταν από παράνομες δραστηριότητες. Με αυτό τον τρόπο, οι
Εναγόμενες βασικά εξαπάτησαν και ξεγέλασαν τις Ενάγουσες 3 και 4 καθώς
επίσης και τους επενδυτές και χρήστες στην πλατφόρμα η οποία τελικώς
χρησιμοποιείτο για ξέπλυμα βρώμικου χρήματος, προκαλώντας ζημιά σε αυτές
με τη χρήση παράνομων μέσων.

Ενόψει δε και της σύναψης συμφωνίας συνεργασίας μεταξύ της Ενάγουσας 4
και των Εναγομένων 2 και 3, Τεκμήριο 10, σαφώς οι τελευταίες έχουν παραβεί
τους όρους αυτής της συμφωνίας, και ειδικότερα τον όρο 14 δυνάμει του οποίου
οι Εναγόμενες διαβεβαίωναν πως δεν χρησιμοποιούσαν τις υπηρεσίες της
Ενάγουσας 4 για παράνομες ή εγκληματικές δραστηριότητες και πως με τη
χρήση των υπηρεσιών της Ενάγουσας 4 δεν παράβαιναν οποιοδήποτε νόμο ή
κανονισμό.

9

Οι αξιώσεις των Εναγόντων βασίζονται σε διάφορες νομικές βάσεις. Θεωρώ πως η παράβαση συμφωνίας αφορά μόνο κάποιους των διαδίκων, ήτοι τις Εναγόμενες 2 και 3 έναντι της Ενάγουσας 4, ενώ τα αστικά αδικήματα της συνωμοσίας, του δόλου, της απάτης και της πρόκλησης ζημιάς με παράνομα μέσα καλύπτουν όλο το φάσμα των γεγονότων και αφορούν όλους τους ως άνω Εναγόμενους ως μέρος αυτής της συνωμοσίας και του σχεδίου. Επομένως, οι αξιώσεις των Εναγόντων εξετάζονται στη βάση της διάπραξης των προαναφερόμενων αστικών αδικημάτων τα οποία δικογραφούνται επαρκώς, αποτελούν μέρος των βάσεων των αξιώσεων και αναμφίβολα στοιχειοθετούνται στη βάση της αποδεκτής μαρτυρίας ως ανωτέρω.

Όσον αφορά το αδίκημα της συνωμοσίας, χρήσιμη ανάλυση για τον τρόπο υπολογισμού των αποζημιώσεων τόσο για οικονομική όσο για μη οικονομική ζημιά περιέχεται στο σύγγραμμα **McGregor on Damages**, 20η έκδοση, σελ. 1615-1619, παρ. 48-019 - 48-025. Επίσης το σύγγραμμα **Clerk & Lindsell on Torts**, 22η έκδοση, σελ. 1319-1325, παρ. 18-39 - 18-48, παρέχει μια διαφωτιστική ανάλυση αναφορικά με τις αποζημιώσεις για το αδίκημα της απάτης.

Είναι καλά γνωστή η νομική αρχή πως οι όποιες ειδικές αποζημιώσεις θα πρέπει να αποδεικνύονται με ακρίβεια - βλ. **Ηρακλέους v. Πέτρου** (1994) 1 Α.Α.Δ. 239 και **Αριστοδήμου v. Πέτρου** (1995) 1 Α.Α.Δ. 98. Σύμφωνα όμως με όσα αναφέρονται στα εν λόγω συγγράμματα για τα υπό κρίση αστικά αδικήματα, κρίνω σκόπιμο να αναφερθώ ειδικά στην αρχή πως ο αιτητής για απάτη θα πρέπει να καταδείξει ότι η ζημιά την οποία υπέστη είναι αποτέλεσμα και απόρροια της απάτης, συμπεριλαμβανομένης της απώλειας μελλοντικού κέρδους, καθώς επίσης και πως αυτός δικαιούται και σε αποζημίωση για οποιαδήποτε άλλη επακόλουθη (consequential) ζημιά η οποία προκλήθηκε από την απατηλή συμπεριφορά (βλ. **Clerk & Lindsell on Torts** (ανωτέρω), σελ. 1323-1324, παρ. 18-45 - 18-47). Επίσης, στο σύγγραμμα **McGregor on Damages** (ανωτέρω), σελ. 1616-1618, παρ. 48-020 - 48-022, αναφέρονται τα εξής:

> «*The damages follow much the same pattern as that in inducement of breach of contract. Thus, while a showing of*

*pecuniary loss is necessary to ground the action for conspiracy, the damages are at large so that, once some pecuniary loss is shown, the damages are not limited to the precise calculation of pecuniary loss actually proved. ...*

*Thus in Noble Resources SA v. Gross, where losses on unauthorized speculative trading in aluminium futures were made, and concealed, by two employees of the claimant companies, it was accepted that the damages in the conspiracy claim were at large and not limited to the loss that could be strictly proved, thereby allowing an award of damages in many millions.*

...

*As with inducement of breach of contract the mail loss is likely to be based upon loss of profits; it was accepted in Lonhro v. Fayed (No. 5), that if the claimants could show loss of profits they could recover for that loss.*

...

*Profit lost and expenses incurred apart, other items of damage may be recoverable. In British Midland Tool Ltd v. Midland International Tooling Ltd, which concerned a conspiracy against the claimant company by a series of its directors and employees who had set up a competitive business next door, together with a company as a vehicle to carry it on, with the result that the claimant company had to close down, damages for loss of the business, trading losses and closure costs were all claimed as being the result of the unlawful conspiracy. The claimant company was held entitled in principle to have damages assessed under all three heads claimed.»*

Στην υπόθεση **Noble Resources SA v. Gross** (2009) EWHC 1435 (Comm), ο εναγόμενος διατάχθηκε να επιστρέψει το ποσό του φιλοδωρήματος που είχε λάβει εκ US$750.000 και επιδικάστηκαν αποζημιώσεις ύψους US$38.071.400. Στην υπόθεση **British Midland Tool Ltd v. Midland International Tooling Ltd**

(2003) EWHC 466 (Ch), επιδικάστηκε ποσό πέραν του ενός εκ. Αγγλικών Στερλινών.

Τέλος, και στα δύο προαναφερόμενα συγγράμματα, υπό διαφορετική σκοπιά, γίνεται αναφορά στη δυνατότητα αποζημίωσης και για τη βλάβη στα αισθήματα (injury to feelings). Στο μεν σύγγραμμα **McGregor on Damages** (ανωτέρω), σελ. 1618-1619, παρ. 48-024 - 48-025, αναφέρεται πως υπάρχει δυνατότητα επιδίκασης αποζημιώσεων σε συνωμοσία για μη οικονομική ζημιά, ήτοι τη βλάβη στα αισθήματα αλλά όχι τη βλάβη στη φήμη και αξιοπιστία, καθότι το τελευταίο αφορά σε δυσφήμιση ή λίβελλο. Τέτοια δυνατότητα καθορίζεται και στο σύγγραμμα **Clerk & Lindsell on Torts** (ανωτέρω), σελ. 1325, παρ. 18-48, όπου αναφέρεται ότι σαφώς σε περίπτωση απάτης, υπάρχει η δυνατότητα επιδίκασης τέτοιων αποζημιώσεων υπό τη μορφή τιμωρητικών επαυξημένων αποζημιώσεων. Χρήσιμη καθοδήγηση ως προς τις τιμωρητικές αποζημιώσεις προσφέρουν επίσης και οι Κυπριακές υποθέσεις **Papakokkinou v. Kanther** (1982) 1 C.L.R. 65, **Adrian Holdings Ltd v. Δημοκρατίας** (1998) 1 Α.Α.Δ. 1836 και **Παπαχρυστοστόμου v. Κώστα Γρηγοριάδη & Συνεταίροι**, Πολ. Έφ. 118/10, ημ. 16.12.15. Στην τελευταία υπόθεση λέχθηκαν χαρακτηριστικά τα ακόλουθα:

> «Αυτές έχουν την έννοια της τιμωρίας του αδικοπραγούντος όταν η συμπεριφορά του καταδεικνύει αφενός έντονη αδιαφορία για τα δικαιώματα των άλλων και αφετέρου την επίτευξη κέρδους στον ίδιο. Οι σχετικές αρχές επεξηγήθηκαν στις Παπακόκκινου v. Κάνθερ (1982) 1 Α.Α.Δ. 65 και Kennedy Hotels Ltd v. Indjirdjian (1992) 1 Α.Α.Δ. 400, στην οποία λέχθηκε ότι οι αποζημιώσεις αυτές δεν είναι αναγκαίο να δικογραφούνται για να αποδοθούν, υπό την προϋπόθεση βεβαίως ότι τα δικογραφημένα γεγονότα είναι τέτοια που δικαιολογούν τη θεραπεία. Να σημειωθεί περαιτέρω ότι οι παραδειγματικές ή τιμωρητικές αποζημιώσεις δίδονται εκεί όπου το δικαστήριο φρονεί ότι οι συνήθεις αποζημιώσεις δεν επαρκούν, αλλά δεν στοχεύουν στην αποκατάσταση του θύματος, όπως είναι οι συνήθεις αποζημιώσεις, ενώ μπορούν να αποδοθούν και αυξημένες αποζημιώσεις που δυνατόν να είναι αρκετές να καλύψουν

ιδιαίτερη βλάβη στον ενάγοντα, (Rookes v. Barnard (1964) 1 All
E.R. 367 και Νικολάου ν. Επίσημου Παραλήπτη (2009) 1 A.A.Δ.
1339).»

Θεωρώ ότι τα αστικά αδικήματα της συνωμοσίας, απάτης, δόλου και
πρόκλησης ζημιάς με παράνομα μέσα, αφορούν σε όλες τις ως άνω
Εναγόμενες, καθώς επίσης και το αστικό αδίκημα των ψευδών παραστάσεων
εκ μέρους των Εναγομένων 2 και 3, αφορά στην Ενάγουσα 4 η οποία
βασιζόμενη στις ψευδείς παραστάσεις προέβη σε συνεργασία με τις
Εναγόμενες 2 και 3 και χρησιμοποιήθηκε ως μέσο υλοποίησης του απατηλού
σχεδίου των ως άνω Εναγομένων. Αυτή η συμπεριφορά των Εναγομένων, η
οποία συνδέθηκε με την Ενάγουσα 4, προκάλεσε ζημία στην τελευταία
οδηγώντας τη βασικά αφενός στο κλείσιμο της επιχείρησης με την ανάκληση
της άδειας λειτουργίας της και αφετέρου στην απώλεια της προοπτικής
επαναδραστηριοποίησης της στον χρηματοοικονομικό τομέα. Τα εμπορικά
ονόματα Mayzus και Moneypolo που χρησιμοποιούσε έχουν πλέον χάσει την
αξιοπιστία τους με αποτέλεσμα η Ενάγουσα 4 να έχει σταματήσει τη χρήση του
Mayzus. Για τον ίδιο λόγο, Τράπεζες στην Κύπρο και στο εξωτερικό είτε
προέβησαν σε τερματισμό της λειτουργίας των λογαριασμών της είτε αρνούνται
να ανοίξουν λογαριασμούς.

Και η Ενάγουσα 3 υπέστη ζημιά ως άμεση συνέπεια των ψευδών
παραστάσεων των Εναγομένων 2 και 3 καθώς επίσης και της ως άνω
συμπεριφοράς του συνόλου των Εναγομένων εφόσον το όλο σχέδιο
συνωμοσίας και απάτης ξεκίνησε από τη διαμεσολάβηση της Ενάγουσας 3
προς την Ενάγουσα 4 για την έναρξη και προώθηση της συνεργασίας μεταξύ
της τελευταίας και των Εναγομένων 2 και 3. Η Ενάγουσα 3 έχει επίσης συνδεθεί
με τις Εναγόμενες και έχει υποστεί οικονομική καταστροφή στην επιχειρηματική
της δραστηριότητα. Το εμπορικό όνομα Okpay που χρησιμοποιούσε έχει πλέον
χάσει την αξιοπιστία του με αποτέλεσμα η Ενάγουσα 3 να υποχρεωθεί να το
αλλάξει χρησιμοποιώντας το Weezzo.

Παρόλο που η Ενάγουσα 2 δεν είχε οποιαδήποτε άμεση σχέση και συνεργασία
με τις Εναγόμενες, εντούτοις θεωρώ πως και αυτή έχει υποστεί ζημιά από την
ως άνω συμπεριφορά των Εναγομένων, εφόσον αυτή ήταν η ιδιοκτήτρια του

εμπορικού ονόματος Okpay το οποίο παραχώρησε προς χρήση στην Ενάγουσα 3. Η διασύνδεση του εν λόγω εμπορικού ονόματος με τη δόλια και απατηλή συμπεριφορά των Εναγομένων είχε ως αποτέλεσμα το εν λόγω όνομα να χάσει την εμπορική του και συνακόλουθα την οικονομική του αξία. Λόγω αυτής της διασύνδεσης, η Ενάγουσα 2 απώλεσε τη δυνατότητα απόκτησης άδειας λειτουργίας της στη Γερμανία και τη πιθανή δραστηριοποίηση της στη Λιθουανία. Για τον ίδιο λόγο, Τράπεζες στο εξωτερικό τερμάτισαν τη λειτουργία των λογαριασμών της Ενάγουσας 4.

Τέλος, ο Ενάγων 1 επίσης έχει υποστεί ζημιά από την ως άνω συμπεριφορά των Εναγομένων. Ειδικότερα, αυτός είναι ο μέτοχος και τελικός δικαιούχος κατά 50% στην Ενάγουσα 2 και εξ ολοκλήρου στην Ενάγουσα 4, με αποτέλεσμα, λόγω της οικονομικής καταστροφής των εν λόγω εταιρειών, αυτός να έχει υποστεί οικονομική ζημιά του δικού του περιουσιακού στοιχείου, ήτοι των μετοχών του στις εν λόγω εταιρείες. Επίσης, το όνομα του συνδέεται με τις εν λόγω Ενάγουσες εταιρείες και αναμφίβολα και εκ των πραγμάτων συνδέθηκε με την προαναφερόμενη συμπεριφορά των Εναγομένων εις βάρος τους, με αποτέλεσμα και αυτός να έχει υποστεί προσωπική ζημιά, καθότι όλες οι Τράπεζες στην Κύπρο και στο εξωτερικό κλείνουν τους λογαριασμούς του, δέχεται απειλές κατά της ζωής του ενώ η ακίνητη περιουσία του, το κάστρο στην Τσεχία, έχει υποστεί κακόβουλη ζημιά και καταστραφεί ολοσχερώς. Επίσης, φαίνεται πως αυτός είχε εγκαθιδρυθεί επιχειρηματικά διεθνώς και αυτό επιβεβαιώνεται από δύο συμφωνίες, στις οποίες κάνει αναφορά στην ένορκη του δήλωση και τις οποίες αποκάλυψε στο Δικαστήριο, δυνάμει των οποίων φαίνεται πως αυτός δημιουργούσε εταιρείες με τη χρήση εμπορικών ονομάτων, και αργότερα προέβη σε συμφωνίες πώλησης του μεριδίου των μετοχών του σε αυτές έναντι πολλών εκατομμυρίων.

Καθοδηγούμενη από τις πιο πάνω νομικές αρχές, θα ασχοληθώ με το ύψος των αποζημιώσεων αναφορικά με καθένα των Εναγόντων ξεχωριστά. Αναφορικά με την Ενάγουσα 4, αυτή έχει σταματήσει τη λειτουργία της λόγω ανάκλησης της άδειας της από την αρμόδια αρχή της Αγγλίας. Έχει προσαχθεί μαρτυρία, η οποία κρίθηκε καθόλα αξιόπιστη, ως προς τις οικονομικές καταστάσεις της εταιρείας για τα έτη 2014-2017, σύμφωνα με τις οποίες διαφαίνεται η ανερχόμενη και αυξητική πορεία της εταιρείας με την ύπαρξη

εισοδήματος το οποίο όμως επενδύονταν στην εταιρεία για την ανάπτυξη της. Ειδικότερα, προκύπτει πως οι επενδύσεις της εταιρείας σε ανθρώπινο δυναμικό και τεχνολογία ήταν σαφώς αυξημένες κατά το 2017 σε σύγκριση με το 2016 (περίπου κατά 1εκ. Αγγλικές στερλίνες), και παρόλο που το 2016 η εταιρεία είχε κέρδη πέραν των 300.000 Αγγλικών στερλινών και επιπλέον διέγραψε χρέος αντίστοιχου ποσού, τα κέρδη το 2016 ήταν 600.000 ενώ το 2017 μόνο 18.072 Αγγλικές στερλίνες λόγω ακριβώς αυτής της ανάπτυξης. Σύμφωνα με τον διευθυντή των ελεγκτών της Ενάγουσας 4, η αποτίμηση της ζημιάς της Ενάγουσας 4 είναι πολύ μεγαλύτερη από οικονομικής και λογιστικής άποψης αφού η αξία της επιχείρησης, σε περίπτωση εκτίμησης, σχετίζεται με την παραγωγική της ικανότητα και το καθαρό κέρδος-εισόδημα στους μετόχους της και πριν την ανάκληση της άδειας λειτουργίας της η αξία της, συμπεριλαμβανομένου και του εμπορικού της ονόματος, ξεπερνούσε τα €15εκ. Με βάση αυτά τα δεδομένα, ικανοποιούμαι πως η Ενάγουσα 4 έχει καταδείξει την απώλεια της αξίας της και επομένως δικαιούται το ποσό της αξίας που απώλεσε λόγω της συμπεριφοράς των Εναγομένων, ήτοι €15εκ. Σαφώς η Ενάγουσα 4 έχει απωλέσει και την όποια δυνατότητα μελλοντικού κέρδους, και παρόλο που δεν υπάρχει σαφής μαρτυρία ως προς τον συνολικό χρόνο ανάκλησης της άδειας λειτουργίας της εφόσον η άδεια έχει μέχρι στιγμής ανακληθεί για έξι μήνες και με δεδομένα τα τελικά ποσά καθαρού κέρδους κατά τα έτη 2014 μέχρι και το 2017, θεωρώ ότι δικαιολογείται η επιδίκαση επιπλέον ποσού της τάξης των €500.000.

Όσον αφορά την Ενάγουσα 3, δεν υπάρχει μαρτυρία όσον αφορά την οικονομική της κατάσταση και ή αξία ούτε και όσον αφορά την οικονομική ή αγοραία αξία του εμπορικού σήματος που χρησιμοποιούσε και υποχρεώθηκε να αλλάξει. Ως εκ τούτου το Δικαστήριο αδυνατεί να καταλήξει στην επιδίκαση οποιουδήποτε ποσού.

Η Ενάγουσα 2 είναι η ιδιοκτήτρια του εμπορικού σήματος Okpay (το οποίο παραχωρούσε στην Ενάγουσα 3) και το οποίο πλέον έχει χάσει την αξία του και δεν δύναται να χρησιμοποιείται για να προσελκύει πελάτες. Οι Ενάγοντες δεν προσκόμισαν οποιαδήποτε μαρτυρία όσον αφορά την αξία αυτού ούτως ώστε είναι επίσης αδύνατο για το Δικαστήριο να καταλήξει στην επιδίκαση οποιουδήποτε ποσού. Επιπλέον, λόγω της διασύνδεσης της Ενάγουσας 2 με

το σκάνδαλο BTC-e και της απώλειας της αξίας του εμπορικού της ονόματος, η Ενάγουσα 2 δεν δύναται να λάβει άδεια δραστηριοποίησης της στη Γερμανία, πλην όμως δεν έχει παρουσιαστεί ίχνος μαρτυρίας ως προς τις προοπτικές αυτής της δραστηριοποίησης και κυρίως την απώλεια κέρδους, ούτως ώστε το Δικαστήριο δεν δύναται να επιδικάσει αποζημιώσεις για μόνο την απώλεια ευκαιρίας αφού ούτε και γι' αυτή έχει παρουσιαστεί κάποια οικονομική μελέτη ή εκτίμηση στη βάση της οποίας θα μπορούσε να ενεργήσει το Δικαστήριο.

Όσον αφορά τον Ενάγοντα 1, αυτός έχει απωλέσει την αξία των μετοχών του στην Ενάγουσα 4. Σύμφωνα με την αποδεκτή μαρτυρία του, αυτός είχε συνάψει συμφωνία πώλησης των μετοχών του έναντι ποσού €20εκ., Τεκμήριο 57, η οποία τερματίστηκε στην 1.8.17, Τεκμήριο 58, λόγω της αρνητικής εικόνας της εταιρείας μετά τη σύλληψη του Εναγομένου 1 όπως ρητώς αναφέρεται στην επιστολή τερματισμού. Επομένως, ο τερματισμός της συμφωνίας προκλήθηκε και οφείλεται αιτιωδώς στη συμπεριφορά των Εναγομένων. Έτσι, ικανοποιούμαι πως ο Ενάγων 1 δικαιούται την αξία αυτή, ήτοι €20εκ., προς αποκατάσταση της ζημιάς την οποία υπέστη από την εν λόγω συμπεριφορά.

Η μαρτυρία του Ενάγοντος 1 πως από το 2015 επένδυσε πέραν των €3εκ. για την προώθηση της Ενάγουσας 2 και πέραν των €500.000 για την προώθηση του εμπορικού σήματος Okpay, του δίνει το δικαίωμα να αξιώνει τη ζημιά που υπέστη από την καταστροφή του ονόματος, εφόσον αυτός είναι δικαιούχος της εταιρείας κατά το 50%. Ως εκ τούτου, παρόλο που δεν υπάρχει σαφής μαρτυρία ως προς την αξία της εν λόγω εταιρείας και του ονόματος της, εντούτοις το Δικαστήριο δύναται να επιδικάσει ένα ποσό της τάξης των €250.000.

Όσον αφορά το όνομα Mayzus, σύμφωνα με την αποδεκτή μαρτυρία του Ενάγοντος 1, αυτός είναι ο ιδρυτής μεγάλου αριθμού εταιρειών σε διάφορες χώρες, στην Κύπρο και στο εξωτερικό, οι οποίες στο όνομα τους περιλαμβάνουν το Mayzus, το οποίο είναι το επίθετο του, το οποίο πλέον έχει χάσει την αξία του, λόγω ακριβώς της διασύνδεσης του με τη συμπεριφορά των Εναγομένων. Ο Ενάγων 1 έχει επενδύσει πέραν των €100εκ. στις εν λόγω εταιρείες και στην προώθηση του συγκεκριμένου εμπορικού ονόματος, για την απόκτηση του οποίου κατέβαλε το ποσό των US$500.000 πριν από πέντε έτη. Θεωρώ ότι ο Ενάγων 1 δικαιούται στην απώλεια της αξίας αυτού του εμπορικού

ονόματος, πέραν της αξίας της Ενάγουσας 4 η οποία χρησιμοποιούσε το όνομα, καθότι αυτό χρησιμοποιείτο και σε άλλες εταιρείες και επομένως η αξία του δεν περιορίζεται μόνο στην Ενάγουσα 4 και σαφώς πρέπει τουλάχιστον να είναι ίση με την αξία αγοράς του. Ως εκ τούτου, θεωρώ πως ο Ενάγων δικαιούται στο ποσό των US$500.000 ή το ισόποσο σε ευρώ.

Το Δικαστήριο δεν δύναται να επιδικάσει αποζημιώσεις για την απώλεια της προοπτικής και δυνατότητας χρήσης του ονόματος για την ίδρυση Τράπεζας με το όνομα Mayzus.

Όσον αφορά την καταστροφή της ακίνητης περιουσίας του, ήτοι του κάστρου στην Τσεχία, θεωρώ πως ελλείψει μαρτυρίας ως προς την αξία αυτού, το Δικαστήριο αδυνατεί να επιδικάσει οποιοδήποτε ποσό στον Ενάγοντα 1. Δημοσίευμα ημ. 21.8.18 ως προς την καταστροφή του κάστρου λόγω της διασύνδεσης του Ενάγοντος με το σκάνδαλο, Τεκμήριο 59, στο οποίο αναφέρεται πως η αξία του εκτιμάται γύρω στα €750.000 δεν αποτελεί ικανοποιητική μαρτυρία ως προς την απόδειξη της αξίας του, ειδικότερα καθότι δεν αποκαλύπτεται η πηγή τέτοιας εκτίμησης, ήτοι κατά πόσο αυτή η εκτίμηση προέρχεται από εμπειρογνώμονα εκτιμητή.

Εδώ είναι σημαντικό να λεχθεί πως το Δικαστήριο ικανοποιείται πως οι Ενάγοντες έλαβαν μέτρα, στο μέτρο των δυνατοτήτων τους, προς μείωση της ζημιάς τους, μέσω της απαίτησης για απόσυρση των δημοσιευμάτων τα οποία φέρονταν να τους συνδέουν με τη λειτουργία της πλατφόρμας BTC-e και το σκάνδαλο που ξέσπασε με αυτή, μέσω της ανάρτησης στην ιστοσελίδα της Ενάγουσας 2 επίσημης δήλωσης πως δεν υπήρχε οποιαδήποτε σχέση των Εναγουσών 2 και 4 με τις Εναγόμενες και την πλατφόρμα, καθώς επίσης και μέσω δηλώσεων του Ενάγοντος 1 απορρίπτοντας οποιαδήποτε σύνδεση τόσο του ιδίου όσο και των εταιρειών του με την πλατφόρμα. Χρήσιμη καθοδήγηση ως προς τις νομικές αρχές της μείωσης της ζημιάς προσφέρει η υπόθεση **Thai Airways International Public Co Ltd v. KI Holdings Co Ltd** (2015) EWHC 1260 Comm, ενώ η αρχή αναγνωρίστηκε και έτυχε εφαρμογής αναφορικά με το αστικό αδίκημα της απάτης στην υπόθεση **Standard Bank v. Pakistan National Shipping Corporation** (2001) 1 All ER Comm. 822 CA. Όπως αναφέρεται στο σύγγραμμα **Clerk & Lindsell on Torts** (ανωτέρω), σελ. 1324,

παρ. 18-47, σε περίπτωση απάτης ο αιτητής έχει υποχρέωση να μειώσει τη ζημιά του στον βαθμό που είναι εύλογα δυνατό να το πράξει, πράγμα που θεωρώ ότι επιχείρησαν στον βαθμό που μπορούσαν οι Ενάγοντες.

Στα πλαίσια της παρούσας Αγωγής το Δικαστήριο δεν ικανοποιείται πως οι Ενάγοντες δικαιούνται σε αποζημιώσεις για προσβολή της φήμης, της αξιοπρέπειας, της αξιοπιστίας και του καλού ονόματος τους, στη βάση της δυσφήμισης εφόσον εδώ δεν υπάρχει οποιαδήποτε δήλωση εκ μέρους των Εναγόντων η οποία να κριθεί ως δυσφημιστική ή όχι. Η παρούσα Αγωγή βασίζεται εξ ολοκλήρου στη συμπεριφορά και στις ενέργειες των Εναγομένων.

Εδώ το Δικαστήριο σημειώνει πως η παραπομπή του δικηγόρου των Εναγόντων σε Αγγλική νομολογία (**Wilson v. United Countries Bank** (1920) 1 A.C. 102 και **Malik v. BCCI** (1997) 1 All ER 1) για την επιδίκαση αποζημιώσεων για απώλεια στη φήμη και το καλό όνομα (stigma damages) δεν εφαρμόζεται στην προκειμένη περίπτωση γιατί οι εν λόγω υποθέσεις αφορούν καθαρά σε παραβάσεις συμφωνίας εργοδότησης και σχέσης εμπιστοσύνης.

Η φύση της συμπεριφοράς των Εναγομένων, όπως αυτή περιγράφεται ανωτέρω, είναι τέτοια που καταδεικνύει παντελή αδιαφορία για τα δικαιώματα των άλλων ήτοι των Εναγόντων, εκμεταλλευόμενοι τις υπηρεσίες τους, για την επίτευξη του δικού τους παράνομου σκοπού, σε βαθμό που οι επιδικασθείσες αποζημιώσεις δεν είναι ικανές να καλύψουν τη βλάβη στους Ενάγοντες και επομένως οι Εναγόμενοι θα πρέπει να τιμωρηθούν για τη συμπεριφορά τους. Λόγω του πιο σημαντικού, καθοριστικού και ενεργού ρόλου των Εναγομένων 2-4, εναντίον αυτών θεωρώ ορθό όπως επιδικαστεί μεγαλύτερο ποσό εν συγκρίσει με τις υπόλοιπες Εναγόμενες.

Ως εκ τούτου το Δικαστήριο καταλήγει πως το ποσό των €300.000 για τον καθένα των Εναγόντων ξεχωριστά αποτελεί δίκαιη αποζημίωση, το ένα τρίτο του οποίου θα επωμιστούν οι Εναγόμενες 2-4 και τα υπόλοιπα δύο τρίτα οι υπόλοιπες Εναγόμενες, στην κάθε περίπτωση αλληλέγγυα και ή κεχωρισμένα.

Σύμφωνα με όλα όσα αναφέρονται ανωτέρω, εκδίδεται απόφαση υπέρ του Ενάγοντος 1 και εναντίον των Εναγομένων 2-4, 6-9, 11, 14 και 16 αλληλέγγυα και ή κεχωρισμένα για το ποσό των €20.250.000 και για το ποσό των

US$500.000 ή το ισόποσο σε ευρώ. Επιπλέον επιδικάζεται υπέρ του Ενάγοντος 1 και εναντίον των Εναγομένων 2-4 αλληλέγγυα και ή κεχωρισμένα το ποσό των €100.000 και εναντίον των Εναγομένων 6-9, 11, 14 και 16 αλληλέγγυα και ή κεχωρισμένα το ποσό των €200.000 ως τιμωρητικές αποζημιώσεις.

Σύμφωνα με όλα όσα αναφέρονται ανωτέρω, επιδικάζεται υπέρ της Ενάγουσας 2 και εναντίον των Εναγομένων 2-4 αλληλέγγυα και ή κεχωρισμένα το ποσό των €100.000 και εναντίον των Εναγομένων 6-9, 11, 14 και 16 αλληλέγγυα και ή κεχωρισμένα το ποσό των €200.000 ως τιμωρητικές αποζημιώσεις.

Σύμφωνα με όλα όσα αναφέρονται ανωτέρω, επιδικάζεται υπέρ της Ενάγουσας 3 και εναντίον των Εναγομένων 2-4 αλληλέγγυα και ή κεχωρισμένα το ποσό των €100.000 και εναντίον των Εναγομένων 6-9, 11, 14 και 16 αλληλέγγυα και ή κεχωρισμένα το ποσό των €200.000 ως τιμωρητικές αποζημιώσεις.

Σύμφωνα με όλα όσα αναφέρονται ανωτέρω, εκδίδεται απόφαση υπέρ της Ενάγουσας 4 και εναντίον των Εναγομένων 2-4, 6-9, 11, 14 και 16 αλληλέγγυα και ή κεχωρισμένα για το ποσό των €15.500.000. Επιπλέον επιδικάζεται υπέρ της Ενάγουσας 4 και εναντίον των Εναγομένων 2-4 αλληλέγγυα και ή ιγομένων 6-9, 11, 14 ι.000 ως τιμωρητικές

ων και εναντίον των ρισμένα όπως αυτά τό το Δικαστήριο συν

. . . . . . . . . . . . . . . . . . . .

Ξφραίμ, Π.Ε.Δ.

**APOSTILLE**
(Convention de La Haye du 5 octobre 1961)

1. Country: CYPRUS

2. This public document has been signed by ...... M. IOANNIDOU PETROU ......

3. acting in the capacity of Registrar District Court

4. bears the seal/stamp of the District Court

Certified          1 1 FEB 2019

5. at Limassol          6. the ..........................................

7. by .PANAGIOTA KONDOUNA.................

8. Lm MJPO No. .....1437/P...........................

9. Seal/stamp:          10. Signature:

For/Permanent Secretary
Ministry of Justice and Public Order

LIMASSOL DISTRICT COURT

BEFORE: E. EFRAIM, President of the District Court

Application No.: 2987/2017

Between:

1. Sergey Mayzus
2. Okpay CY Limited
3. Okpay Inc.
4. Mayzus Financial Services Ltd trading under the brand name Moneypolo

Claimants

v.

1. Alexander Vinnik
2. Canton Business Corporation
3. Always Efficient LLP
4. Eurostyle Advisor Ltd
5. Strategies Provider Ltd
6. Voix Impex LP
7. Edelvace Limited
8. Asomar Investments Ltd
9. Fairplay Finance Limited
10. Micrastur Development Ltd
11. Nicos INC
12. Hill Chance Limited
13. Zilon LP
14. Chartwood Technology LLP
15. Global Network Solutions
16. Neptune Media Ltd
17. Gem Invest LP

Defendants

Application filed by the Claimants on 24.7.18 for Judgment

Date: 1 February 2019

Appearances:
For the Claimants: Mr A. Paphitis with Mrs N. Liasidou for A.G. Paphitis & Co LLC
For the Defendants 2-4, 6-9, 11, 14 and 16: no appearance

## JUDGMENT

With the present application, the Claimants - Applicants are requesting the Court to enter judgment against Defendants 2-4, 6-9, 11, 14 and 16 for failing to file appearance in the action.

It shall be noted that the original Application concerned Defendants 2-17, but was eventually limited to the aforesaid Defendants. The Action brought against Defendant 1, who was the only Defendant having filed appearance, was withdrawn without prejudice.

In defending the Action, the Defendants filed an affidavit of the Defendant in English, accompanied by a true translation in Greek of the same and a large number of exhibits. It is worth mentioning that in his affidavit the Defendant refers to some elements which he did not wish to reveal in the affidavit, but were eventually presented to Court thus enabling the same to study them.

The attorneys for the Claimants were invited by the Court to present their oral arguments regarding the legal aspect of the case, and in particular regarding the nature and the legal grounds on which the application is made.

First of all, the Court is satisfied that service of the present Action out of jurisdiction has been duly effected on the Defendants concerned, namely on Defendants 2-4, 6, 9, 11, 14 and 16, in accordance with the Court order dated 8.1.18, and on Defendants 7 and 8 within the Republic of Cyprus, as it appears from the relevant affidavits for service entered in the case file. In addition, the Court is satisfied that the aforementioned Defendants failed to file a memorandum of appearance within or at any time after the time limited for appearance.

I have carefully read the content of the generally endorsed writ, the statement of claim, the

3

Claimant's affidavit and the exhibits attached thereto in support of the case. I consider that the testimony adduced by the Claimant, in addition to having remained undenied, shows consistency and logic and is confirmed by the attached exhibits, and is therefore considered fully credible and is adopted as the Court's findings with regard to the facts of the case to the extend they concern the Defendants for the purpose of the present proceedings.

In short, the facts of the case are as follows:

(i)    Claimant 1 is a permanent resident of Limassol and an internationally famous businessman in the financial and investment sector known for being one of the persons having devised the Forex online transactions. He is the owner of a large number of businesses in all sectors in Cyprus, the Czech Republic, England and Russia. He served as Mayor of a city in Russia from 2008 to 2013, is an honorary person in Russia, Cyprus and the Czech Republic and is involved in financing various sports and other cultural events.

(ii)    Claimant 1 is 50% shareholder of Claimant 2 and 100% shareholder of Claimant 4.

(iii)    Claimant 2 is an electronic payment providing company, registered in Cyprus and licensed to operate as an Electronic Money Institution by the Central Bank of Cyprus since 2015. He is the proprietor of Okpay and Weezzo trade marks.

(iv)    Claimant 3 is a company based in the British Virgin Islands acting, since 2009, as the broker of Claimant 4 in accordance with a cooperation agreement. Claimant 2 was established following a joint venture between Claimant 1, by way of money investment, and Claimant 3, which contributed to the creation of the e-money services platform and the provision of the Okpay trade mark.

(v)    Claimant 4 is a company registered in London, licensed to operate as a Payment Institution by the English Supervising Authority of Financial Services, the Financial Conduct Authority (FCA), since 2009 under the name Mayzus FC and MFS, and the owner of Mayzus and Moneypolo trade marks.

(vi)    In November 2012, Defendant 4, acting on behalf of Defendant 1, approached Claimant 3 for the opening of payment accounts. The account was opened to Claimant 4 after the mediation of Claimant 3.

(vii)    Accounts were then opened to Claimant 4 by Defendants 2 and 3 as well, which Defendant 1 was acting on behalf thereof. More specifically, Defendant 2 was the

owner of the BTC-e platform and Defendant 3 was the administrator thereof, which (platform) was operated through Claimant 4. The public could open an account on the platform with Defendant 3 from where they would carry out transactions (purchasing and selling) with fiat currencies, such as bitcoin, on which Defendants 2 and 3 received commissions. Then, the money (commissions) would be deposited to the accounts maintained by Defendants 3 and 4 with Claimant 4, which, in turn, would make payments to third parties upon orders given on behalf of Defendants 2 and 3 as well.

(viii)   Claimant 4 agreed to this cooperation as these activities were legitimate and did not require authorisation from England. To this end, agreements were signed for the provision of services by Claimant 4 to Defendants 2 and 3.

(ix)    During the aforementioned cooperation, Claimant 4 would credit all the amounts to the accounts of Defendants 3 and 4, and then transfer the same either to third party accounts or the account of Defendant 2. In some cases, Defendant 3 would transfer money to Defendant 4, which would then make payments to different companies all over the world, including the aforementioned Defendant companies, in order to settle invoices. This cooperation involves a huge volume of transactions. Indicatively, between 1.7.17 and 20.7.17, the amounts received amounted to a total of 7.753.056 US$ and 5.665€. The payments made following the instructions of Defendant 4 amount to a total of 124.844. It shall be noted that all these transactions were presented to Court in electronic form (usb) which the Court had the opportunity to go over and confirm that it involved a huge volume of transactions.

(x)    Due to the particular nature and huge volume of the transactions, Claimant 4 filed on 28.5.14 a relevant report to the NCA of England, and since it did not receive a reply, then it could continue to carry out its activities normally.

(xi)    During the years between 2015 and 2017, the BTC-e platform served the world's largest volume of transactions, and in June-July 2017 recorded more than US$66m transactions per day.

(xii)    The activities of the platform continued normally until 25.7.17, namely until the enforcement of the judgment issued by the Court of California, USA, ordering to track down and arrest Defendant 1, being the proprietor of Defendant 2 and the creator of the platform, as well as to shut down the platform on the grounds of conspiracy to

launder money, money laundering and participation in illegal currency transactions. With the platform's shutdown, it is estimated that a number of people worldwide lost between US$200-400m.

(xiii)    As it appeared from the judgment, the platform was used, from 2011 to 2017, by at least 700.000 users worldwide, including politicians, public figures and drugs dealers for the purpose of laundering money.

(xiv)    The whole matter took on such proportions and gained so much publicity that the Claimants have been linked to the BTC-e platform as alleged collaborators.

(xv)    Claimant 4 requested the publications be withdrawn, posted an official statement on the website of Claimant 2 that they had no connection with the Defendants and the platform, and announced that the money received after 26.7.17 would be returned to the beneficiaries. Claimant 1 also made statements rejecting any connection of both himself and his companies with the platform.

(xvi)    Unfortunately, the matter took on massive proportions resulting in the BTC-e scandal, the link of the Claimants therewith and the use of threats to Claimant 1 himself and his family.

(xvii)    Claimant 1 reported the incident to the Unit for Combating Money Laundering (MOKAS) in Cyprus, while in October 2017 the Supreme Civil and Criminal Court of Greece, Areopagus, ratified the extradition of Defendant 1 in the USA for laundering US$4bn through the BTC-e platform owned by Defendant 2 from Thessaloniki and in September 2018 in Russia. Claimant 1 was invited as a witness to these proceedings. A request of the French Authorities for the extradition of Defendant 1 for fraud offences against French citizens amounting to €130m is also pending.  Reports have been published according to which Defendant 1 has admitted deceiving Russian investors through the platform for a damage amounting to 750m Russian rubles.

(xviii)    Following a relevant investigation and based on different sources, it was revealed that, in addition to the Defendants, several other persons were involved in the scandal. It was also revealed that Defendants 6-9, 11, 14 and 16 were dummy companies to which money was sent through the platform based on fake and dummy invoices. The money was sent by Claimants 3 and 4 upon the instructions of Defendants 2-4. A very small number of such transfers amounts to €10m.

(xix)    Due to the foregoing, both Claimant 1 and Claimants 2-4 were affected and destroyed both professionally and financially.

(xx)     Banks in Cyprus and abroad stopped cooperating with them in the belief that they were involved in the scandal.

(xxi)    The operating licence of Claimant 4 was revoked by the FCA of England for three months in July 2017 and for another three months in October.

(xxii)   Claimant 2 has been rejected by the German Authorities to operate in the country.

(xxiii)  The Okpay and Moneypolo trade marks have been compromised. The former was renamed to Weezzo whereas Claimant 4 has been destroyed and has ceased to use the trade name Mayzus.

(xxiv)   The agreement for the sale of shares of Claimant 1 to Claimant 4 against €20m was scuppered due to their connection with the said scandal.

(xxv)    The potential of establishing a Bank under the name Mayzus has disappeared.

(xxvi)   The Central Bank of Cyprus fails to respond to the application for licence submitted by Claimant 2 to operate in Lithuania.

(xxvii)  The name, reputation and dignity of Claimant 1 have been compromised and affected.

(xxviii) A property of his in the Czech Republic, specifically an 18th century castle, was completely destroyed by fire.

The civil offence of fraud was interpreted in **Tsiartas, et al. v. Alocay Holdings Ltd, et al.** (2010) 1 (C) Judgment of the Supreme Court *1523*, during which it was said that *"According to the Halsbury's Laws of England, 3rd ed., vol. 18, p. 189, the concept of fraud is defined as something dishonest and morally wrong, particularly the acquisition of pecuniary or material benefits by unfair means (See also Iakovou v. Laiki Bank of Cyprus Ltd. (2004) 1(B) Judgment of the Supreme Court 992)."* The constituent elements of the civil offence of conspiracy were referred to in the English case **Kuwait Oil Tanker Company SAK and another v. Al Bader and others** (2000) All ER (D) 692 as follows:

> *"The two types of conspiracy, namely conspiracy to injure by lawful means and conspiracy to injure by unlawful means, were better regarded as species of the same tort, although it mattered not. It was true that in the case of lawful means conspiracy the tort had been developed principally in the sphere of trade disputes*

> *and industrial relations disputes, but there was no authority to support the submission that the unlawful means conspiracy was limited to that context. The effect of the principal authorities was simply that, in order to establish an unlawful means conspiracy, it was necessary to establish an intention to injure the claimant but not a predominant intention or purpose to do so. Although an intention to injure the claimant had to be proved, there was no reason why such an intention could not be inferred from the acts themselves. Where the unlawful means were tortious the conspiracy did not merge in the tort; there was no authority or principle to restrict the tort in that way."*

The aforementioned facts show that Defendants 2-4, 6-9, 11, 14 and 16 are part of a conspiracy and implementation of a fraudulent and deceitful plan through the use of the services of Claimant 4. More specifically, Defendants 2 and 3 presented themselves to Claimants 3 and 4 as carrying out legitimate activities and the said Claimants, based on these representations, which were eventually proved to be fake, agreed to cooperate with them. The above Defendants, with the participation of mainly Defendants 2-4, used the services of Claimants 3 and 4 with the purpose of implementing their fraudulent and deceitful plan, namely the creation and use of the BTC-e platform to move and channel to all the above Defendants money deriving from illegal activities. In this way, Defendants have basically deceived and tricked Claimants 3 and 4 as well as the investors and users of the platform, which was eventually used to launder money, thus causing injury thereto by unlawful means.

In view of the cooperation agreement concluded between Claimant 4 and Defendants 2 and 3, Exhibit 10, these latter have clearly violated the terms thereof and, more specifically, term 14, according to which the Defendants affirmed that the services of Claimant 4 were not used for illegal or criminal activities nor was the use of such services violating any law or regulation.

The Claimants' claims are founded on several legal grounds. I consider that the breach of the agreement involves only some of the parties to these proceedings, namely Defendants 2 and 3 against Claimant 4, whereas the civil offences of conspiracy, deception, fraud and injury caused by unlawful means cover the whole spectrum of the facts and involve all the above Defendants as part of the conspiracy and plan. Therefore, the Claimants' claims are examined on the grounds of committing the above civil offences, which are sufficiently filed in the case, constitute part of

the grounds to the claims and are undoubtedly founded on the accepted evidence as above.

With regard to the offence of conspiracy, a useful analysis on how to calculate both pecuniary and non-pecuniary damages is found in **McGregor on Damages**, 20th edition, p. 1615-1619, par. 48-019- 48-025. In addition, **Clerk & Lindsell on Torts**, 22nd edition, p. 1319-1325, par. 18-39 - 18-48 provides an informative analysis on damages resulting from fraud.

The legal principle that requires precise proof of any special damages is well known (see **Heracleous v. Petrou** (1994) 1 Judgment of the Supreme Court 239 and **Aristodemou v. Petrou** (1995) 1 Judgment of the Supreme Court 98). Based, however, on what is referred to in the said publications regarding the civil offences in question, I believe it would be appropriate to specifically refer to the principle that the applicant should prove that the losses suffered is the result of fraud, including loss of future profit, and that he is entitled to compensation for any consequential losses caused by the fraudulent conduct (see **Clerk & Lindsell on Torts** (above), p. 1323-1324, par. 18-45- 18-47). In addition, **McGregor on Damages** (above), p. 1616-1618, par. 48-020 - 48-022, states the following:

> "The damages follow much the same pattern as that in inducement of breach of contract. Thus, while a showing of pecuniary loss is necessary to ground the action for conspiracy, the damages are at large so that, once some pecuniary loss is shown, the damages are not limited to the precise calculation of pecuniary loss actually proved. ...
>
> Thus in Noble Resources SA v. Gross, where losses on unauthorized speculative trading in aluminium futures were made, and concealed, by two employees of the claimant companies, it was accepted that the damages in the conspiracy claim were at large and not limited to the loss that could be strictly proved, thereby allowing an award of damages in many millions.
>
> ...
>
> As with inducement of breach of contract the mail loss is likely to be based upon loss of profits; it was accepted in Lonhro v. Fayed (No. 5), that if the claimants could show loss of profits they could recover for that loss.
>
> ...

9

> Profit lost and expenses incurred apart, other items of damage may be recoverable. In British Midland Tool Ltd v. Midland International Tooling Ltd, which concerned a conspiracy against the claimant company by a series of its directors and employees who had set up a competitive business next door, together with a company as a vehicle to carry it on, with the result that the claimant company had to close down, damages for loss of the business, trading losses and closure costs were all claimed as being the result of the unlawful conspiracy. The claimant company was held entitled in principle to have damages assessed under all three heads claimed."

In **Noble Resources SA v. Gross** (2009) EWHC 1435 (Comm), the defendant was ordered to repay his bonus of US$750.000, and damages of US$38.071.400 were awarded. In **British Midland Tool Ltd. v. Midland International Tooling Ltd** (2003) EWHC 466 (Ch), an amount of more than one million British pounds was awarded.

Finally, the two aforementioned publications, each in a different perspective, make reference to the possibility of damages being awarded for injury to feelings too. In **McGregor on Damages** (above), p. 1618-1619, par. 48-024 - 45-025, reference is made to the possibility to award damages for non-pecuniary losses, namely for injury to feelings and not for damage to reputation and reliability since this concerns defamation or libel. Such possibility is also determined in **Clerk & Lindsell on Torts** (above), p. 1325, par. 18-24, which states that, in case of fraud, there is a possibility to award such damages in the form of aggravated punitive damages. Useful guidance as to the punitive damages is also provided by the Cypriot cases of **Papakokkinou v. Kanther** (1982) 1 C.L.R 65, **Andrian Holdings Ltd v. The Republic** (1998) 1 Judgment of the Supreme Court 1836 and **Papachrysostomou v. Costas Gregoriades & Associates**, Civil Appeal 118/10 of 16.12.15. In this latter, the following were stated:

> "These have the meaning of the offender's punishment when his conduct shows, on one hand, strong indifference to the rights of others and, on the other, the realisation of profit thereto.    The relevant principles were explained in Papakokkinou v. Kanther (1982) 1 Judgment of the Supreme Court 65 and Kennedy Hotels Ltd v. Indjirdjian (1992) 1 Judgment of the Supreme Court 400, stating that such damages do not require to be filed in the proceedings in order

> to be awarded, provided of course that the facts filed are such that justify the
> remedy. It shall be further noted that the exemplary or punitive damages are
> awarded where the court considers that the actual damages are inadequate, but
> are not intended to compensate the injured, as the actual damages are, while
> aggravated damages, sufficient to compensate special damage caused to the
> claimant, may also be awarded (Rookes v. Barnard (1964) 1 All E.R. 367 and
> Nikolaou v. The Official Receiver (2009) 1 Judgment of the Supreme Court
> 1339)."

I consider that the civil offences of conspiracy, fraud, deception and injury caused by unlawful means concern all the above Defendants, and the civil offence of false representation on behalf of Defendants 2 and 3 concern Claimant 4, which, acting on the false representations, concluded a cooperation agreement with Defendants 2 and 3 and was used as a means for the implementation of the fraudulent plan of the above Defendants. This conduct of the Defendants, which has been linked to Claimant 4, caused damage to this latter, resulting, on one hand, to the closure of its business following the revocation of its licence to operate, and, on the other, to the loss of prospect of resuming its activities in the financial sector. The brand names Mayzus and Moneypolo used thereby have now lost their credibility, causing Claimant 4 to stop using the brand name Mayzus. For the same reasons, banks in Cyprus and abroad either terminated the operation of its accounts or refuse to open accounts.

Claimant 3 also suffered damage as a direct consequence of the false representations made by Defendant 2 and 3 and of the above conduct of all the Defendants, since the whole plan of conspiracy and fraud started from the mediation of Claimant 3 to towards Claimant 4 for the commencement and promotion of a cooperation between this latter and Defendants 2 and 3. Claimant 3 has also been linked to the Defendants and has suffered a financial disaster in its business. The brand name Okpay used thereby has now lost its credibility, causing Claimant 3 to change it and start using the brand name Weezzo.

Although Claimant 2 had no direct relation and cooperation with the Defendants, nevertheless, I consider that it has also suffered from the conduct of the Defendants, since Claimant 2 was the owner of the brand name Okpay and assigned Claimant 3 the right to exploit it. The link of the said brand name to the deceitful and fraudulent conduct of the Defendants resulted in the said

name losing its commercial and, hence, its financial value. Due to this link, Claimant 2 has lost every potential to obtain an operating licence in Germany and potentially operate in Lithuania. For the same reason, banks abroad terminated the operation of the accounts of Claimant 4.

Finally, Claimant 1 has also suffered damage from the above conduct of the Defendants. More specifically, he is the 50% and 100% shareholder and final beneficiary of Claimant 2 and Claimant 4, respectively, resulting - because of the financial destruction of the said companies - in his assets, namely his shares in the said companies, having suffered a financial loss. In addition, his name is linked to the said Defendant companies and has undoubtedly and de facto been linked to the aforementioned conduct of the Defendants, resulting in him having suffered personal damage, since all Banks in Cyprus and abroad closed his accounts, he has been receiving threats against his own life while his real estate, the castle in the Czech Republic, has been maliciously damaged and completely destroyed. Furthermore, it appears that he was professionally established at an international level, and this is confirmed by the two agreements, which he makes reference to in his affidavit and which he revealed in Court, according to which it appears that he would create companies with the use of brand names, his shares in which he would later sell through sale agreements against many millions.

Guided by the above legal principles, I shall now deal with the amount of damages regarding each of the Defendants separately. As far as Claimant 4 is concerned, this has ceased to operate due to the revocation of its licence by the competent authority of England. A testimony, which was considered entirely unreliable, has been produced regarding the financial statements of the company for the years between 2014 and 2017, which show the company's growing performance with the existence of income which was invested in the company for the growth thereof. More specifically, it appears that the company's investments in human resources and technology were clearly increased in 2017 in comparison to 2016 (by about 1m British pounds), and although in 2016 the company earned more than 300,000 British pounds and wrote off a debt of an equivalent amount, the profits in 2016 were 600.000 while in 2017 were only 18.072 British pounds precisely because of this investment. According to the director of audit of Claimant 4, the valuation of the loss incurred by Claimant 4 is far greater from a financial and an accounting point of view, since the value of the business, if estimated, is related to its production capacity and the net profit-income of its shareholders, and prior to the revocation of its operating licence, its value, including

that of its brand name, exceeded the amount of €15m. With this in mind, I am satisfied that Claimant 4 has proven the loss of its value and is, therefore, entitled to the amount of the value lost due the conduct of the Defendants, namely €15m. It is clear that Claimant 4 has also lost any potential for future profit, and although there is no clear evidence of the total duration of its licence revocation, since the licence has, until present, been revoked for 6 months, and given the final net profit figures during the years between 2014 and 2017, I consider that the award of an additional sum in the order of €500.000 is justified.

As far as Claimant 3 is concerned, there is no evidence of its financial status or value nor of the economic or market value of the trade mark it used and was forced to change. Therefore, the Court cannot conclude on the award of any amount.

Claimant 2 is the owner of the trade mark Okpay (assigned to Claimant 3) which has now lost its value and cannot be used to attract customers. The Claimants did not produce any evidence as to the value thereof, therefore, the Court cannot conclude on the award of any amount. Furthermore, due to its link to the BTC-e scandal and the loss of its brand name value, Claimant 2 is unable to obtain a licence to operate in Germany. However, there is no evidence as to the prospects of such operation and, in particular, to the loss of profit, therefore, the Court cannot award damages only for the loss of opportunity, since no financial study or assessment was produced thereof that would render the Court able to rule on.

As far Claimant 1 is concerned, he has lost the value of the shares he owned in Claimant 4. According to his acceptable testimony, he had concluded an agreement for the sale of his shares against the amount of €20m, Exhibit 57, which was terminated on 1.8.17, Exhibit 58, due to the negative image of the company after the arrest of Claimant 1 as explicitly referred to in the letter of termination. Therefore, the termination of the agreement was caused and is causally attributable to the Defendants' conduct. Thus, I am satisfied that Claimant 1 is entitled to this value, namely €20m, against the damage incurred thereby as a result of this conduct.

The testimony of Claimant 1 that, since 2015, he has invested more than €3m for the promotion of Claimant 2 and more than €500.000 for the promotion of the trade mark Okpay, gives him the right to claim the loss suffered as a result of the damage caused to the name, since he is the beneficiary of the company by 50%. Therefore, although there is no clear evidence as to the value and the name of the said company, nevertheless, the Court awards an amount in the order of

€250.000.

As far the name Mayzus is concerned, according to the acceptable testimony of Claimant 1, he is the founder of a large number of companies in several countries, in Cyprus and abroad, which include in their name the name Mayzus - the surname of the Claimant - which has now lost its value due to its link to the Defendants' conduct. Claimant 1 has invested more than €100m in these companies and in promoting the specific brand name, for the acquisition of which he paid, five years ago, the amount of US$500.000. I consider that Claimant 1 is entitled to the loss of the value of this brand name, in addition to the value of Claimant 4 which used the name, since this was also used by other companies and its value is, therefore, not only limited to Claimant 4, and should clearly be at least equal to its market value. Therefore, I consider that the Claimant is entitled to the amount of US$500.000 or an equal amount in Euro.

The Court cannot award damages for the loss of the prospect and possibility of use of the name for the establishment of a bank under the name Mayzus.

With regard to the destruction of his property, namely the castle in the Czech Republic, I consider that in the absence of evidence as to the value thereof, the Court cannot award any amount to Claimant 1. The article published on 21.8.18 regarding the destruction of the castle due to the Claimant's link to the scandal, Exhibit 59, stating that its value is estimated at around €750,000, does not constitute a satisfactory proof of its value, since the source of such estimation and whether such estimation comes from an expert valuer is not disclosed.

At this point, it is important to mention that the Court is satisfied that the Claimants have taken measures, to the extent possible, to reduce their damage by requesting the withdrawal of publications linking the Claimants to the operation of the BTC-e platform and the scandal that broke out in connection thereto, by posting on the website of Claimant 2 an official statement stating that there was no connection of Claimants 2 and 4 with the Defendants and the platform, as well as by statements made by Claimant 1, rejecting any link of both himself and his companies to the platform. Useful guidance as to the legal principles on reducing damage is provided by **Thai Airways International Public Co Ltd v. KI Holdings Co Ltd** (2015) EWHC 1260 Comm, while the principle was recognised and applied regarding the civil offence of fraud in **Standard Bank v. Pakistan National Shipping Corporation** (2001) 1 All ER Comm. 822 CA. As mentioned in **Clerk & Lindsell on Torts** (above), p. 1324, par. 18-47, in case of fraud, the applicant has an

obligation to reduce the damage incurred thereby to the extent that is reasonably possible to do so, which I consider that the Claimants have attempted to do so to the extent possible.

In the context of this Action, the Court is not satisfied that the Claimants are entitled to damages resulting from damage to their reputation, dignity and reliability of their name on the grounds of defamation, since no statement is made on behalf of the Claimants which could be considered as defamatory or not. The present Action is entirely founded on the conduct and the actions of the Defendants.

At this point, the Court shall point out that the reference made by the attorneys for the Claimants to the English case-law (Wilson v. United Countries Bank (1920) 1 A.C. 102 and Malik v. BCCI (1997) 1 All ER 1) for the award of damages for the loss of the reputation and the good name (stigma damages) is not applicable to the present case because the said cases clearly involve breach of employment agreement and the relationship of trust.

The nature of the Defendants' conduct, as described hereinabove, is such that it shows complete indifference to the rights of others, namely of the Claimants, taking advantage of their services in order to achieve their own unlawful purpose, to the extent that the damages awarded are inadequate to compensate for the damage suffered by the Claimant, and, therefore, the Defendants should be punished for their conduct. Due to the more significant, determining and active role of Defendants 2-4, I consider it appropriate that a greater amount be awarded against the same in comparison to the rest of the Defendants.

Therefore, the Court concludes that the amount of €300,000 for each Defendant separately constitutes a fair compensation, one third of which should be incurred by Defendants 2-4 and the remaining two thirds by the rest of the Defendants, in each case jointly and severally.

Based on the aforementioned, judgment is given in favour of Claimant 1 and against Defendants 2-4, 6-9, 11, 14 and 16, jointly and severally, for the amount of €20,250,000 and for the amount of US$500,000 or an equivalent amount in Euro. In addition, the amount of €100,000 is awarded in favour of Claimant 1 and against Defendants 2-4, jointly and/or severally, and the amount of €200,000 as punitive damages against Defendants 6-9, 11, 14 and 16, jointly and/or severally.

Based on the aforementioned, the amount of €100,000 is awarded in favour of Claimant 2 and against Defendants 2-4, jointly and/or severally, and the amount of €200,000 as punitive damages

against Defendants 6-9, 11, 14 and 16, jointly and/or severally.

Based on the aforementioned, judgment is given in favour of Claimant 4 and against Defendants 2-4, 6-9, 11, 14 and 16, jointly and severally, for the amount of €15.500.000. In addition, the amount of €100.000 is awarded in favour of Claimant 4 and against Defendants 2-4, jointly and/or severally, and the amount of €200.000 as punitive damages against Defendants 6-9, 11, 14 and 16, jointly and/or severally.

The costs of the Action are awarded in favour of the Claimants and against Defendants 2-4, 6-9, 11, 14 and 16, jointly and/or severally, as these shall be calculated by the Registrar and approved by the Court, plus VAT.

(Sgd.) .........................

E. Efraim, President of the District Court

True Copy

Registrar

**APOSTILLE**

(Convention de La Haye du 5 octobre 1961)

1. Country: CYPRUS

   This public document

2. has been signed by M. IOANNIDOU PETROU

3. acting in the capacity of Registrar District Court

4. bears the seal/stamp of the District Court

Certified

5. at Limassol                    6. the 11 February 2019

7. by PANAYIOTA KOUDOUNA

8. Lm MJPO No. 14439/19

9. Seal / stamp:           10.   Signature:        *[Signature]*

   *[Ministry of Justice*                    For/Permanent Secretary
   *and Public Order]*              Ministry of Justice and Public Order

ΕΠΑΡΧΙΑΚΟ ΔΙΚΑΣΤΗΡΙΟ ΛΕΜΕΣΟΥ
ΕΝΩΠΙΟΝ: Ε. Εφραίμ, Π.Ε.Δ.

Αρ. Αγωγής: 2987/2017

ΜΕΤΑΞΥ:
1.   Sergey Mayzus
2.   Okpay CY Limited
3.   Okpay Inc.
4.   Mayzus Financial Services Ltd που εμπορεύεται ως Moneypolo

ΕΝΑΓΟΝΤΩΝ

και

1.   Alexander Virnik
2.   Canton Business Corporation
3.   Always Efficient LLP
4.   Eurostyle Advisor Ltd
5.   Strategies Provider Ltd
6.   Voix Impex LP
7.   Edelvace Limited
8.   Asomar Investments Ltd
9.   Fairplay Finance Limited
10.  Micrastur Development Ltd
11.  Nicos INC
12.  Hill Chance Limited
13.  Zilon LP
14.  Chartwood Technology LLP
15.  Global Network Solutions
16.  Neptune Media Ltd
17.  Gem Invest LP

ΕΝΑΓΟΜΕΝΩΝ

Κατόπιν εμφάνισης της αγωγής αυτής στην παρουσία του κ. Α. Παφίτη με κα. Ν. Λιασίδου για κ.κ. Α.Γ. Παφίτης & Σία ΔΕΠΕ, δικηγόρων για τους Ενάγοντες, των Εναγόμενων 2-4, 6-9, 11, 14 και 16 μη παρευρισκομένων παρόλο ότι τους επιδόθηκε δεόντως πιστό αντίγραφο της αγωγής αυτής και μετά την ακρόαση των ισχυρισμών του υπό ή εκ μέρους των Εναγόντων,

Το Δικαστήριο αυτό δια του παρόντος ΔΙΑΤΑΤΤΕΙ και ΑΠΟΦΑΣΙΖΕΙ όπως:

1.   Οι Εναγόμενοι αρ. 2-4, 6-9, 11, 14 και 16 να πληρώσουν αλληλεγγύως και/ή κεχωρισμένως στον Ενάγοντα 1 το ποσό των €20.250.000 με τόκο προς 3,5% ετησίως επ' αυτού από 25/10/2017 μέχρι 31/12/2018, πλέον τόκο προς 2% από 01/01/2019 μέχρι εξοφλήσεως.

2.   Οι Εναγόμενοι αρ. 2-4, 6-9, 11, 14 και 16 να πληρώσουν αλληλεγγύως και/ή κεχωρισμένως στον Ενάγοντα 1 το ποσό των US$500.000 ή το ισότοσο σε Ευρώ με τόκο προς 3,5% ετησίως επ' αυτού από 25/10/2017 μέχρι 31/12/2018, πλέον τόκο προς 2% από 01/01/2019 μέχρι εξοφλήσεως.

3.   Οι Εναγόμενοι αρ. 2-4 να πληρώσουν αλληλεγγύως και/ή κεχωρισμένως στον Ενάγοντα 1 το ποσό των €100.000.- με τόκο προς 3,5% ετησίως επ' αυτού από 25/10/2017 μέχρι 31/12/2018, πλέον τόκο προς 2% από 01/01/2019 μέχρι εξοφλήσεως.

4.   Οι Εναγόμενοι αρ. 6-9, 11, 14 και 16 να πληρώσουν αλληλεγγύως και/ή κεχωρισμένως ως τιμωρητικές αποζημιώσεις στον Ενάγοντα 1 το ποσό των €200.000.- με τόκο προς 3,5% ετησίως επ' αυτού από 25/10/2017 μέχρι 31/12/2018, πλέον τόκο προς 2% από 01/01/2019 μέχρι εξοφλήσεως.

5.   Οι Εναγόμενοι αρ. 2-4 να πληρώσουν αλληλεγγύως και/ή κεχωρισμένως στην Ενάγουσα 2 το ποσό των €100.000.- με τόκο προς 3,5% ετησίως επ' αυτού από 25/10/2017 μέχρι 31/12/2018, πλέον τόκο προς 2% από 01/01/2019 μέχρι εξοφλήσεως.

...2

BEFORE THE DISTRICT COURT OF LIMASSOL

## **AFFIDAVIT**

I the undersigned, Georgia Nicolaides, from Limassol, ID Card No. 888200, do hereby take oath and say as follows:

1. I am a translator, holder of the French National Graduate and Postgraduate Degree Applied Foreign Languages: translation of business-economic-legal-political affairs, Paul Valéry University, France, and of the National Higher Professional Award in Specialised Studies in Translation: Professional Translation, Paul Valéry University, France, Member of the Pan Cyprian Union of Graduate Translators and Interpreters, Member Id: PanUTI M54, working languages: Greek, English, French and Russian.

2. I have in my above capacity acquired linguistic skills and techniques in professional translation in the business, financial, legal, political, technical and scientific fields, and have by this capacity translated the Greek document (source text) to English (target text) as attached.

3. The English translation is to the best of my knowledge a true and faithful translation of the source text in Greek.

4. The source text in Greek and the translation in English are here below attached as EXHIBIT A and EXHIBIT B, respectively.

THE AFFIANT

...................................
Georgia Nicolaides
Translator

Sworn and signed before me
this ..... of February 2019
in the District Court of Limassol

REGISTRAR

Nektarios Pippiros

-2-

6. Οι Εναγόμενοι αρ. 6-9, 11, 14 και 16 να πληρώσουν αλληλεγγύως και/ή κεχωρισμένως ως τιμωρητικές αποζημιώσεις στην Ενάγουσα 2 το ποσό των €200.000.- με τόκο προς 3,5% ετησίως επ' αυτού από 25/10/2017 μέχρι 31/12/2018, πλέον τόκο προς 2% από 01/01/2019 μέχρι εξοφλήσεως.

7. Οι Εναγόμενοι αρ. 2-4 να πληρώσουν αλληλεγγύως και/ή κεχωρισμένως στην Ενάγουσα 3 το ποσό των €100.000.- με τόκο προς 3,5% ετησίως επ' αυτού από 25/10/2017 μέχρι 31/12/2018, πλέον τόκο προς 2% από 01/01/2019 μέχρι εξοφλήσεως.

8. Οι Εναγόμενοι αρ. 6-9, 11, 14 και 16 να πληρώσουν αλληλεγγύως και/ή κεχωρισμένως ως τιμωρητικές αποζημιώσεις στην Ενάγουσα 3 το ποσό των €200.000.- με τόκο προς 3,5% ετησίως επ' αυτού από 25/10/2017 μέχρι 31/12/2018, πλέον τόκο προς 2% από 01/01/2019 μέχρι εξοφλήσεως.

9. Οι Εναγόμενοι αρ. 2-4, 6-9, 11, 14 και 16 να πληρώσουν αλληλεγγύως και/ή κεχωρισμένως στην Ενάγουσα 4 το ποσό των €15.500.000 με τόκο προς 3,5% ετησίως επ' αυτού από 25/10/2017 μέχρι 31/12/2018, πλέον τόκο προς 2% από 01/01/2019 μέχρι εξοφλήσεως.

10. Οι Εναγόμενοι αρ. 2-4 να πληρώσουν αλληλεγγύως και/ή κεχωρισμένως στην Ενάγουσα 4 το ποσό των €100.000.- με τόκο προς 3,5% ετησίως επ' αυτού από 25/10/2017 μέχρι 31/12/2018, πλέον τόκο προς 2% από 01/01/2019 μέχρι εξοφλήσεως.

11. Οι Εναγόμενοι αρ. 6-9, 11, 14 και 16 να πληρώσουν αλληλεγγύως και/ή κεχωρισμένως ως τιμωρητικές αποζημιώσεις στην Ενάγουσα 4 το ποσό των €200.000.- με τόκο προς 3,5% ετησίως επ' αυτού από 25/10/2017 μέχρι 31/12/2018, πλέον τόκο προς 2% από 01/01/2019 μέχρι εξοφλήσεως.

12. Οι Εναγόμενοι αρ. 2-4, 6-9, 11, 14 και 16 να πληρώσουν αλληλεγγύως και/ή κεχωρισμένως στους Ενάγοντες, το ποσό των €203,00 έξοδα εκδόσεως της απόφασης αυτής πλέον έξοδα της αγωγής όπως θα υπολογιστούν από τον Πρωτοκολλητή και θα εγκριθούν από το Δικαστήριο.

ΕΚΔΟΘΗΚΕ ΤΗΝ:    01.02.2019
ΣΥΝΤΑΧΘΗΚΕ ΤΗΝ  06.02.2019

(Υπ.) Ε. Εφραίμ, Π.Ε.Δ.

ΠΙΣΤΟΝ ΑΝΤΙΓΡΑΦΟ

ΠΡΩΤΟΚΟΛΛΗΤΗ

ΑΑ

**APOSTILLE**
*(Convention de La Haye du 5 octobre 1961)*

1. Country: CYPRUS

2. This public document has been signed by ........... ( Iv. Charlonti )

3. acting in the capacity of Registrar District Court

4. bears the seal/stamp of the District Court

Certified     1 1 FEB 2010

5. at Limassol

6. the ........................

7. by ......... PANAGIOTA KOUDOUNA

8. Lm MJPO No. 14433 IP

9. Seal/stamp:

10. Signature:

For/Permanent Secretary
Ministry of Justice and Public Order

EXHIBIT B

**LIMASSOL DISTRICT COURT**
BEFORE: E. Efraim, President of the District Court

Action No.: 2987/2017

BETWEEN:
1. Sergey Mayzus
2. Okpay CY Limited
3. Okpay Inc.
4. Mayzus Financial Services Ltd trading under the brand name Moneypolo

CLAIMANTS

and

1. Alexander Vinnik
2. Canton Business Corporation
3. Always Efficient LLP
4. Eurostyle Advisor Ltd
5. Strategies Provider Ltd
6. Voix Impex LP
7. Edelvace Limited
8. Asomar Investments Ltd
9. Fairplay Finance Limited
10. Micrastur Development Ltd
11. Nicos INC
12. Hill Chance Limited
13. Zilon LP
14. Chartwood Technology LLP
15. Global Network Solutions
16. Neptune Media Ltd
17. Gem Invest LP

DEFENDANTS

After this action was brought before the Court for a hearing in the presence of Mr A. Paphitis with Mrs N. Liasidou for Messieurs A.G. Paphitis & Co LLC, attorneys for the Claimants, the Defendants 2-4, 6-9, 11, 14 and 16 failing to appear despite having been duly served with a true copy of this action, and after hearing the claims by and on behalf of the Claimants,

**This Court hereby ORDERS and DECIDES that:**

1.   Defendants 2-4, 6-9, 11, 14 and 16 pay jointly and/or severally to Claimant 1 the amount of €20.250.000 with an interest thereon at 3.5% per annum from 25/10/2017 to 31/12/2018, plus interest at 2% from 01/01/2019 until repayment.

2.   Defendants 2-4, 6-9, 11, 14 and 16 pay jointly and/or severally to Claimant 1 the amount of US$500.000 or an equivalent amount in Euro with an interest thereon at 3.5% per annum from 25/10/2017 to 31/12/2018, plus interest at 2% from 01/01/2019 until repayment.

*[Signature and rubber stamp:
CHRISTODOULOS CHARALAMBOUS
Registrar]*

3. Defendants 2-4 pay jointly and/or severally to Claimant 1 the amount of €100.000 with an interest thereon at 3.5% per annum from 25/10/2017 to 31/12/2018, plus interest at 2% from 01/01/2019 until repayment.

4. Defendants 6-9, 11, 14 and 16 pay jointly and/or severally as punitive damages to Claimant 1 the amount of €200.000 with an interest thereon at 3.5% per annum from 25/10/2017 to 31/12/2018, plus interest at 2% from 01/01/2019 until repayment.

5. Defendants 2-4 pay jointly and/or severally to Claimant 2 the amount of €100.000 with an interest thereon at 3.5% per annum from 25/10/2017 to 31/12/2018, plus interest at 2% from 01/01/2019 until repayment.

6. Defendants 6-9, 11, 14 and 16 pay jointly and/or severally as punitive damages to Claimant 2 the amount of €200.000 with an interest thereon at 3.5% per annum from 25/10/2017 to 31/12/2018, plus interest at 2% from 01/01/2019 until repayment.

7. Defendants 2-4 pay jointly and/or severally to Claimant 3 the amount of €100.000 with an interest thereon at 3.5% per annum from 25/10/2017 to 31/12/2018, plus interest at 2% from 01/01/2019 until repayment.

8. Defendants 6-9, 11, 14 and 16 pay jointly and/or severally as punitive damages to Claimant 3 the amount of €200.000 with an interest thereon at 3.5% per annum from 25/10/2017 to 31/12/2018, plus interest at 2% from 01/01/2019 until repayment.

9. Defendants 2-4, 6-9, 11, 14 and 16 pay jointly and/or severally to Claimant 4 the amount of €15.500.000 with an interest thereon at 3.5% per annum from 25/10/2017 to 31/12/2018, plus interest at 2% from 01/01/2019 until repayment.

10. Defendants 2-4 pay jointly and/or severally to Claimant 4 the amount of €100.000 with an interest thereon at 3.5% per annum from 25/10/2017 to 31/12/2018, plus interest at 2% from 01/01/2019 until repayment.

11. Defendants 6-9, 11, 14 and 16 pay jointly and/or severally as punitive damages to Claimant 4 the amount of €200.000 with an interest thereon at 3.5% per annum from 25/10/2017 to 31/12/2018, plus interest at 2% from 01/01/2019 until repayment.

12. Defendants 2-4, 6-9, 11, 14 and 16 pay jointly and/or severally to the Claimants the amount of €203,00 on entry of this judgment, plus the costs relating to this action, as these shall be calculated by the Registrar and approved by the Court.

ISSUED ON:      01.02.2019
DRAWN UP ON:    06.02.2019

(Sgd.) E. Efraim, President of the District Court

TRUE COPY

*[Signature]*

REGISTRAR

*[Signature and rubber stamp:*
*CHRISTODOULOS CHARALAMBOUS*
*Registrar]*

**APOSTILLE**
(Convention de La Haye du 5 octobre 1961)

1. Country: CYPRUS

   This public document

2. has been signed by Chr. Charalambous

3. acting in the capacity of Registrar District Court

4. bears the seal/stamp of the District Court


Certified

5. at Limassol                         6. the 11 February 2019

7. by PANAYIOTA KOUDOUNA

8. Lm MJPO No. 14438/19

9. Seal / stamp:                10.     Signature:        *[Signature]*

   *[Ministry of Justice*                          For/Permanent Secretary
   *and Public Order]*                        Ministry of Justice and Public Order