IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America,
Plaintiff,
v.
All virtual currency held in the BTC-e operating wallets
as of July 25, 2017, and other assets further described herein,
Defendants in rem.

Civil Action No. 1:25-cv-02085-CJN
Hon. Carl J. Nichols

PRO SE CLAIMANT KEVIN REILLY'S MOTION FOR DISCLOSURE
OF TOTAL CUSTOMER ASSET BALANCES IN BTC-e SERVER DATA

INTRODUCTION

Pro se Claimant Kevin Reilly moves this Court for an order requiring the Government to disclose the total customer Litecoin balance reflected in the BTC-e server data as of July 25, 2017, and to explain any difference between that figure and the approximately 2,249.25 LTC recovered in the operating wallet seizure conducted between August 7 and August 11, 2017. Claimant further requests disclosure of equivalent figures for each cryptocurrency denomination identified in the Government's complaint as Group A Defendant Assets.

The Government's own complaint creates an arithmetic problem it has never addressed. The complaint identifies over one million BTC-e users. In December 2017 — the peak of that year's cryptocurrency boom — Litecoin ranked fifth globally by market capitalization according to CoinGecko's annual cryptocurrency market report. It was not a fringe asset. It was one of the most widely held digital currencies in the world. Claimant alone held 1,883.70 LTC — approximately 83% of the entire seized LTC pool of 2,249.25 LTC. The proposition that a single accountholder among more than one million users held 83% of a major international exchange's entire position in a top-five global cryptocurrency is not credible on its face. One possible explanation is that the operating wallet seizure captured only a fraction of BTC-e's total customer holdings — a question the server data can answer definitively.

Claimant does not assert as established fact that BTC-e maintained cold storage wallets that were not captured in the seizure. Claimant asserts something more fundamental: the arithmetic documented in the Government's own complaint raises a question about the completeness of the seizure that only the server data can answer. Whether the explanation is cold storage architecture, asset movement in the days following the domain seizure, or some other factor, the question is the same: what did total customer LTC balances reflect in the BTC-e server data as of July 25, 2017, and how does that figure relate to the 2,249.25 LTC recovered? The



RECEIVED

JUL 03 2026

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

Government possesses the server data that would answer this question. Claimant requests that the Court order it produced.

BACKGROUND

I.   THE GOVERNMENT'S COMPLAINT DOCUMENTS AN INCOMPLETE SEIZURE.

The case caption describes this proceeding as involving 'all virtual currency held in the BTC-e operating wallets as of July 25, 2017.' The Government's own complaint contradicts that characterization. The FBI arrested Alexander Vinnik and seized the BTC-e domain on July 25, 2017. The complaint then documents the following actual seizure dates for Group A cryptocurrency assets:

Bitcoin: seized between August 2 and August 17, 2017 — eight to twenty-three days after the domain seizure.

Ether: seized August 5, 2017 — eleven days after the domain seizure.

Litecoin: seized between August 7 and August 11, 2017 — thirteen to seventeen days after the domain seizure.

Namecoin: seized August 10, 2017 — sixteen days after the domain seizure.

Novacoin and Dash: seized August 7 through August 11, 2017.

Approximately 929.5 BTC transferred to an external wallet address on or about July 31, 2017 — six days after the domain seizure.

Approximately 485,705.46 ETH held in an external wallet address as of July 30, 2017 — five days after the domain seizure.

The assets identified in the complaint as Group A Defendant Properties were not all secured on July 25, 2017. They continued moving through the exchange's systems for days and in some cases weeks after the domain seizure. Assets moved to external wallet addresses in the days immediately following the seizure — behavior consistent with automated exchange systems continuing to operate after the primary operator's arrest. The case caption's description of these assets as 'held in the BTC-e operating wallets as of July 25, 2017' is a legal characterization that does not reflect the operational reality documented in the Government's own complaint.

The Government's complaint does not represent that the operating wallet seizure captured all customer assets held on BTC-e. It describes what was seized from the operating wallets during a rolling seizure window that extended nearly a month beyond the July 25 domain seizure. The relationship between those operating wallet contents and total customer deposits reflected in

BTC-e's server data is a question the complaint leaves entirely unaddressed — and that Claimant is entitled to have answered.

## II.  BTC-e WAS A SOPHISTICATED EXCHANGE WHOSE ARCHITECTURE RAISES QUESTIONS ABOUT THE COMPLETENESS OF THE SEIZURE.

BTC-e was an international cryptocurrency exchange with over one million registered users, processing thousands of transactions daily across multiple cryptocurrency denominations for years prior to the 2017 seizure. Litecoin — one of the primary currencies traded on BTC-e — ranked fifth globally by market capitalization in late 2017. On an exchange of this scale handling one of the world's most widely held digital assets, the relationship between operating wallet contents at the moment of seizure and total customer deposits is not self-evident.

Professional cryptocurrency exchanges of BTC-e's scale and duration typically operated with a distinction between liquid operating wallets — maintaining funds sufficient for daily customer redemptions and immediate withdrawals — and separate storage holding the balance of customer deposits. This architecture is not speculative; it is the operational standard for exchanges handling thousands of daily transactions and is reflected in the asset movement documented in the Government's own complaint — assets continuing to move through BTC-e's systems for days and in some cases weeks after the July 25 domain seizure.

Claimant does not assert that BTC-e necessarily maintained such an architecture or that any specific quantity of customer assets exists beyond the operating wallet seizure. Claimant asserts that the question cannot be answered without the server data — and that the arithmetic documented in the Government's own complaint makes the question unavoidable. A seized pool of 2,249.25 LTC from an exchange with over one million users trading a top-five global asset is either a comprehensive capture of customer deposits or it is not. The server data will show which.

## III. THE ARITHMETIC COMPELS DISCLOSURE.

The Government's complaint identifies BTC-e as having over one million registered users. Claimant Kevin Reilly held 1,883.70 LTC at BTC-e as of July 25, 2017, as set forth in his verified claim filed under penalty of perjury. The Government's complaint identifies 2,249.25 LTC as the total Litecoin recovered in the operating wallet seizure.

Claimant's 1,883.70 LTC represents approximately 83% of that seized pool. This arithmetic, standing alone, raises a question the Government has never addressed. Litecoin was the fifth largest cryptocurrency by global market capitalization in December 2017. BTC-e had over one million users. The proposition that a single accountholder held 83% of the total LTC recovered from a major international exchange handling one of the world's most widely held digital assets warrants scrutiny — not as an assertion of wrongdoing, but as an arithmetic question that the server data the Government already possesses can answer definitively.

There are several possible explanations for this arithmetic. One is that total customer LTC deposits on BTC-e were genuinely concentrated and the operating wallet seizure captured substantially all of them. Another is that the operating wallet seizure captured a fraction of total customer deposits, with the remainder held elsewhere in BTC-e's systems. A third is that asset movement in the days following the July 25 domain seizure — documented in the Government's own complaint — affected the completeness of the recovery. Claimant does not assert which explanation is correct. Claimant asserts that the Court and the parties are entitled to know, and that the Government's server data will answer the question.

The BTC-e server data, which the Government has represented it possesses in complete form and can query for individual account activity, would show total customer LTC balances across all accounts. That figure would either confirm the 2,249.25 LTC seizure as a comprehensive capture of customer holdings — a conclusion the arithmetic makes implausible — or it would reveal that the operating wallet seizure captured a fraction of actual customer deposits. Claimant is entitled to know which, and the Court is entitled to have that information before evaluating any distribution framework.

The same arithmetic applies to every Group A asset. The Government seized approximately 925.93 Bitcoin and approximately 4,036.92 Ether from an exchange with over one million users trading assets that ranked first and second globally by market capitalization. Each of these figures warrants the same scrutiny as the LTC figure, and the server data the Government already possesses can answer the question for every denomination simultaneously.

ARGUMENT

I.   THE REQUESTED DISCLOSURE IS DIRECTLY RELEVANT AND PROPORTIONAL.

Federal Rule of Civil Procedure 26(b)(1) permits discovery of information relevant to any party's claim or defense and proportional to the needs of the case. The total customer asset balances in the BTC-e server data are directly relevant to three issues central to this proceeding.

First, they are relevant to the integrity of the distribution framework. Any distribution to claimants must be built on an accurate understanding of what the Government actually holds relative to total customer deposits. A distribution framework constructed on operating wallet seizures alone, without accounting for the relationship between those seizures and total customer deposits, cannot fairly compensate claimants.

Second, they are relevant to Claimant's individual damages assessment. Claimant is a professional trader and thirty-year member of the Chicago Board of Trade whose working capital was frozen through three complete market cycles over nine years. His peak position valuation reached approximately $721,000 in May 2021. His damages calculation requires an accurate understanding of the total asset pool against which his claim is measured and the completeness of the Government's recovery from BTC-e.

Third, they are relevant to the Court's oversight of this proceeding. The Government has cited resource constraints and case complexity as justifications for nine years of delay. A Government that possesses server data showing total customer balances — data it has represented it can query for individual accounts — but has not disclosed aggregate figures to claimants or to this Court is not well-positioned to invoke complexity as a continuing justification for that delay.

II.  THE GOVERNMENT HAS ALREADY REPRESENTED IT CAN EXTRACT THIS DATA.

The Government has indicated to this Court on multiple occasions that it possesses the complete BTC-e server data and can determine users' historical account activity from that data. Those representations were made to justify the Government's ability to verify individual claimant account balances.

If the Government can determine individual account balances from the server data — which it has represented it can — it can determine aggregate customer balances across all accounts. Aggregate totals are among the simplest operations available to any database analyst. They require a single summation query against data the Government already possesses. A system capable of reconstructing individual account histories across years of transactions is unquestionably capable of producing a sum of current balances. The Government cannot simultaneously represent that individual account reconstruction is within its capabilities and that aggregate balance disclosure is not.

Claimant holds professional credentials in exchange data systems. Extracting aggregate totals from an existing database is a routine operation that can be completed in minutes using standard data tools. The Government's own February 10, 2026 Status Report acknowledged that it 'did not appreciate until recently' the volume of cross-currency trading on BTC-e. A Government that is still developing its understanding of the data it has possessed for nine years is not positioned to represent that aggregate balance disclosure would impose meaningful burden.

RELIEF REQUESTED

For the foregoing reasons, Claimant respectfully requests that the Court order the Government to produce, within fourteen (14) days of the Court's order:

1.  The total customer Litecoin balance reflected in the BTC-e server data as of July 25, 2017, across all customer accounts;

2.  A written explanation of any difference between that figure and the approximately 2,249.25 LTC recovered in the operating wallet seizure conducted between August 7 and August 11, 2017, including the current status and location of any customer LTC holdings not captured in the operating wallet seizure;

3.   Equivalent total customer balance figures for each cryptocurrency denomination identified as Group A Defendant Assets in the Government's complaint, together with equivalent explanations of any difference between those figures and the amounts recovered in the operating wallet seizures; and

4.   Such other and further relief as the Court deems just and proper.

Respectfully submitted,



Kevin Reilly
kreilly100@gmail.com
262-893-8902
Pro Se Claimant
Dated: July 3, 2026

CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2026, I caused a copy of the foregoing Motion to be served upon counsel of record via the Court's CM/ECF system and by email to joshua.sohn@usdoj.gov, allison.ickovic@usdoj.gov, and catherine.pelker@usdoj.gov.

/s/ Kevin Reilly
Kevin Reilly

EXHIBIT A — MEET AND CONFER EMAIL CHAIN

July 2, 2026 — Kevin Reilly to Joshua Sohn:

Pursuant to Local Rule 7(m), I am writing to confer regarding a potential motion for disclosure of asset totals held in the BTC-e server database. Specifically, I intend to seek an order requiring the Government to disclose the total customer LTC balance reflected in the BTC-e server data as of July 25, 2017, and to explain any difference between that figure and the approximately 2,249.25 LTC recovered in the operating wallet seizure between August 7 and August 11, 2017. The Government's complaint identifies over one million BTC-e users. Claimant held 1,883.70 LTC, representing approximately 83% of the total seized LTC pool. The disparity between those

figures raises a question that is directly material to any distribution framework. Please let me know by end of day whether the Government will produce this information voluntarily or whether I should proceed with a motion.

July 2, 2026 — Joshua Sohn to Kevin Reilly:

I'm on vacation this week but happy to have a telephonic meet-and-confer as soon as next Monday. Let me know your availability.

July 2, 2026 — Kevin Reilly to Joshua Sohn:

Thank you for your response. I am also on vacation next week and need to file by July 9 given the July 10 status conference. Is there someone else at MLARS who can conduct the call on your behalf? I am available any day this week at your convenience.

July 2, 2026 — Joshua Sohn to Kevin Reilly:

I am the only MLARS (now MNF) attorney with knowledge of the issues. Reiterate my willingness to confer as soon as Monday. Given that any hypothetical motion you might file would not be fully briefed (much less decided) by July 10, I fail to see why that date has any talismanic importance in terms of when you might file.

July 3, 2026 — Kevin Reilly to Joshua Sohn:

I have made a good faith effort to confer as required by Local Rule 7(m). I contacted you promptly, explained the issue with specificity, provided a reasonable response deadline, and requested alternative coverage when you indicated you were unavailable. Your representation that you are the sole MNF attorney with institutional knowledge of these issues is itself noteworthy and I expect it will be relevant at the July 10 conference. Under these circumstances the purposes of Local Rule 7(m) have been fulfilled. I will proceed with my motion.


EXHIBIT B — COINGECKO 2017 YEAR IN REVIEW

CoinGecko, 2017 Year in Review — Cryptocurrency Report. Available at: https://assets.coingecko.com/reports/2017-Year-in-Review-Cryptocurrency-Report-by-CoinGecko.pdf

Relevant finding: At the peak of the December 2017 cryptocurrency market, the top five cryptocurrencies by global market capitalization were: (1) Bitcoin, (2) Ethereum, (3) Bitcoin Cash, (4) XRP, and (5) Litecoin.